## THE HEIRS OF HOLMAN, ET AL. v. THE BANK OF NORFOLK.

| 12 | 369 |
| 126 | 308 |

1. An act of the legislature of this State, authorizing the administratrix of O. H., of the city of Boston, to sell certain real estate of O. H., in the city of Mobile, and requiring a bond to be executed with sufficient security, payable to the judge of the county court of Mobile, for the true and faithful payment of the money arising from the sale into the hands of the administratrix, to be appropriated to the payment of the debts due by the deceased—is not an exercise of judicial power by the legislature, or contrary to the constitution of this State. If in fact the estate was not insolvent, so as to authorize a sale of the real estate by order of the orphans' court, the heirs, on coming of age, may assert title. It does not invalidate the law, that citation was not required to be made to the heirs previous to the sale, and that the administratrix resided in Massachusetts.

2. An allegation in a bill in chancery, brought to perfect the title to land, that B. held the deed of the administratrix, by virtue of a sale made of one-half the property under the authority of the act of the legislature, as cited,

47

Heirs of Holman, et al. v. Bank of Norfolk.

is a sufficient allegation of title in B, without an allegation, that the bond required by the statute to be executed previous to the sale, was in fact executed, and being put in issue by the heirs, those claiming under B, may prove the execution of the bond.

3. The order to examine a co-defendant as a witness, does not ascertain his competency to testify, and if at the hearing, it appears he was interested, his testimony will be rejected.

4. A party improperly made a defendant, and who wishes to be discharged without the payment of costs, must not only disclaim all interest in the controversy, but must also abstain from engaging in the defence of the suit.

5. Neither a remittance of money, to one as the agent of a bank, and his consent to receive it as such, nor his admissions, or the fact that he is a director of the bank, have any tendency to prove that he is the agent of the bank. The consent of the bank that he should so act, is necessary.

6. An agreement by counsel in one suit, of the existence of a fact, is not proof of the fact, in another suit, with which the former has no connection.

7. Depositions taken between the same parties, may be given in evidence in another suit, where the same point is in issue.

8 When the object is not to establish the facts stated by a witness, but to impeach his credit, a deposition made by him in another suit, and between other parties, is evidence to contradict him. The rule of law established in the Queen's case, does not apply.

9. A bill is not multifarious, because it seeks to foreclose a mortgage upon an entire tract of land; and asks a specific performance as to one-half the land, from the heirs of the vendor of the mortgagor.

10. A covenant, by which H bound himself to give B a quit-claim deed to one half a tract of land, (which is described,) " to be executed within two years from the date," is not a contract for the sale of land, within the meaning of the statute of frauds, but is an unconditional promise to convey, by a time stipulated, and is *prima facie* evidence, that the consideration had been paid, or performed.

11. Upon a bill filed by B, or those claiming under him, against the heirs of H., for a specific performance of this contract, B having taken possession under it, the instrument is *prima facie* evidence under the statute, that it was made upon sufficient consideration.

12. A decree may be made against one of two heirs, who submits to the jurisdiction, though the other from *non*-residence, cannot be made a party to the bill.

13. An allegation, that a mortgagor was seized, or pretended to be seized in fee simple of the land, when he executed the mortgage, is a sufficient allegation that he was in possession.

14. Objections to a bill of revivor, that notice was not given of the intended application to the register, must be made in the first instance to the chancellor, or they cannot be raised in this court.

15. Proof by old residents of Mobile, who had resided there before, and since

the execution of the deed, that they never knew or heard of such persons as the witnesses to the deed in this State, is *prima facie* sufficient, to prove non-residence, and let in the secondary evidence.

16. A mortgagee may release a part of the mortgaged estate, from the operation of his mortgage, without impairing his right to look to the residue ; and this, although subsequent to the mortgage, the mortgagor had transferred a part of the estate to others. Whether equity would not grant relief on the ground of fraud, if the mortgagee should collude with the mortgagor, to make the burthen fall on a sub-purchaser of the mortgagor, *Quere.*

17. *Non*-residents may be made parties to suits in chancery, whether infants, or adults, by publication, when the contract out of which the suit arises, is made in this State, or when any act is done by the non-resident in this State, justifying the interference of chancery, or when he asserts title to property in this State, in virtue of some act or transaction, which took place within this State.

Appeal from the Chancery Court of Mobile.

THE bill was filed by the appellees, to foreclose a mortgage executed, to-wit, on the 29th March, 1828, by Charles Brown and wife, on certain property in the city of Mobile, to secure the payment of $20,000, evidenced by three promissory notes of $6,666 67 each, dated 29th May, 1828, payable at one, two, and three years, the interest being payable *semi*-annually. The estate mortgaged is particularly described in the bill, the mortgage having been duly recorded.

The bill was filed on the 20th March, 1834, and subsequently, a decree *pro confesso* was taken against Brown and wife.

Considerable delay appears to have taken place, and the report of a master was made, showing, that several other persons claimed an interest in the land mortgaged, by conveyances from Brown, and finally, at the March term, 1842, by leave of the court, the complainant filed a supplemental bill, in which, after reciting the substance of the original bill, it states, that Brown, subsequently to the mortgage, conveyed a certain portion of the mortgaged estate to Sheffield & Barney, and believing that the residue of the mortgaged estate, was sufficient to secure the debt, at the instance of Brown, and Sheffield & Barney, the bank executed to Brown,

a release of all the estate so conveyed to Sheffield & Barney.

That Brown afterwards, on the 1st May, 1831, mortgaged said premises to one Charles Copeland, and afterwards, on the 23d September, 1832, conveyed said premises to him, by deed in *fee simple.* That Copeland, on the 2d May, 1834, conveyed by deed a certain portion of the premises, to Remsen & Jude, and on the 15th April, 1835, another portion to James W. Roper—on the 1st September, 1835, another parcel to John W. Mott and Charles E. Thompson—on the 28th August, 1835, another parcel to John J. Morrell—on the 1st September, 1835, another parcel to Thomas Mather—on the 2d February, 1836, another parcel to E. Baker; which said several parcels embraced all the real estate mortgaged by Brown and wife to complainant.

That Remsen & Jude, conveyed all their interest to Bartlett & Waring, who are now, together with E. L. Anderson and Joseph Wiswall, in possession of all the estate conveyed to Remsen & Jude. That Mott & Thompson have conveyed their interest to Woodruff and Watkins, who are now in possession thereof. That Thomas Mather has departed this life, and Olivia, his widow, has administered upon his estate, and has intermarried with Edward McKinstry. That the remainder of said estate is in possession of, and claimed by Olivia Holman, and Agnes Howard, a minor, Eliphalet Baker, Harriet and Eliza Judson, Seaborn Travis, Olivia A. McKinstry, and Edward McKinstry, as the representatives of Thomas Mather, Mills Judson, Waldon B. Post, Nehemiah Denton, Nehemiah Wilkins, heir of Samuel Wilkins, now a minor, and Gorham Davenport, all of whom claim to have some interest in said mortgaged premises.

The bill charges, that all the lands so conveyed by Copeland, are subject to the mortgage, and that no part of the mortgage money has been paid by Brown, except the interest on the note first due, to the 1st April, 1833, $495, on the 22d July, 1829, $2168 78, on the 29th June, 1830, $987 50, on the 14th February, 1830, $883 33, on the 23d June, 1831, and on the same day, $1766 67. On the second note interest has been paid to the 1st April, 1831, and on the third

note, interest has been paid to the 1st April, 1833; all of which are credited on the notes.

That reposing in the honor and integrity of Copeland, who had purchased the property subject to the mortgage, and at his urgent request, complainant entered into a contract with him, on the 25th January, 1834, by which the bank agreed to transfer all their interest, by quit claim deed, upon his payment of the mortgage debt, with all costs, &c.; which agreement is made an exhibit to the bill.

That the payments described as made on the principal sum of the first note, were made by Benjamin Copeland, who during that period, was a director of the Bank of Norfolk, and continued so, until some time prior to the filing of the bill; that Copeland received and paid the said sums by the directions of Brown. That in addition to the sums so received, they received the sum of $2104, arising from the rents of the mortgaged premises, but that Copeland claimed the same, as rents accruing to him subsequent to his purchase, and upon legal advice, paid the same over to him on the 5th November, 1833. It is expressly alledged that Copeland has never paid any money on account of the mortgage, except as above set forth, and that he has no other interest in the mortgage than as stated.

The bill further charges, that the estate mortgaged, was acquired by Brown, from one Oliver Holman, now deceased, who in his life-time, to wit, on the 29th September, 1821, executed to Charles Brown his obligation, covenanting to convey to said Brown, one-half the land he had purchased from McKenzie & Swett, which are the same lands conveyed by Brown in his mortgage to the bank. The covenant is made an exhibit to the bill, and is as follows:

"Know all men by these presents, that I, Oliver Holman, do hereby bind myself, to give Charles Brown, my quit claim deed of one-half part of all the land, which I purchased from McKenzie & Swett, in the city of Mobile, on the 28th January, 1818, (except one certain piece, or parcel of land, lying, being, and situate, in said city of Mobile, and bounded as follows: commencing at Water street, running eastward on the flats of Mobile river seventy feet, thence southward to Holman & Brown's wharf thirty-five feet, thence westward

by Holman & Brown's wharf seventy feet to Water street so called, thence northwardly by Water street to the first mentioned boundary thirty-five feet, be the same more or less. Also one other piece, or parcel of land, lying and being situate in the city of Mobile, and bounded as follows: commencing at Water street, east, by Holman & Brown's wharf seventy feet, south thirty-five feet, to premises of Daniel Paul, thence westwardly to said Paul's premises, to Water street seventy feet, thence by Water street north to the first mentioned boundary thirty-five feet, be the same more or less. (Both of the said pieces of land, I do not deed to the said Charles Brown,) together with the buildings thereon. Also the wharf, with the reservation of passing to and fro, for the distance upon said wharf, to my buildings, in case I should have any on my land; this deed to be executed within two years from the date, if the said Charles requests.

"In virtue whereof, I the said Oliver Holman, has hereto set his hand and seal, this 29 Sep'r, 1821.

Witness,                                       OLIVER HOLMAN, [seal.]
*John Holman*,
*Abram Holman*."

Complainants alledge, that Brown complied with, and performed all the covenants on his part to be performed, and that before the time for making a deed, O. Holman departed this life, viz., in the summer of 1822, and that Sarah Holman, his widow, and Oliver Holman, and Agnes Howard, are his representatives and heirs at law. That after the death of Oliver Holman, the said Sarah took out letters of administration upon the said Oliver Holman's estate, and by authority of an act of the legislature of the State of Alabama, the said administratrix conveyed by deed to the said Charles Brown, all the interest of said Oliver remaining in said estate, purchased of McKenzie & Swett, for the sum of $——; a copy of which deed is made an exhibit, and which is exclusive of the interest covenanted to be conveyed by Holman to Brown.

The bill further charges, that the heirs of Holman, by collusion with some of the purchasers from Copeland, have entered into, and have possession of certain portions of the premises, and are in the enjoyment and receipt of the rents, and that they are wholly insolvent and irresponsible. That

owing to the destruction by fire, of much of the valuable improvements, the security intended to be afforded by the mortgage is impaired.

That since the report of the master, ascertaining the sum of $24,357 26, to be due upon the mortgage, no further payment has been made.

All these persons are made parties, the prayer of the bill is, for an account and foreclosure of the mortgage—that the heirs of Holman be decreed to make such deed, as their ancestor was bound to make, and that the premises be sold for the payment of the mortgage debt, unless otherwise satisfied.

Sarah Holman, the widow of Oliver Holman, answered the bill, and disclaimed all interest in the estate in controversy.

Oliver Holman also answered the bill, and admitted that he, in conjunction with Agnes Howard, was in possession of two lots, part of the land covered by the mortgage, but denies all collusion, having recovered them by suit at law, as the property of his ancestor, from those in possession. He admits that his ancestor died in 1822, seized in fee of the premises—that afterwards, in 1823, G. Davenport and N. Littlefield, represented that his ancestor was indebted, and in December, 1823, the legislature of Alabama passed an act to authorize the administratrix of O. Holman to sell his real estate. That Sarah Holman was administratrix in Massachusetts, but not in Alabama. Is ignorant whether the bond required by law to be given by Davenport and Littlefield was given, or not, but admits that under color of this act, they conveyed an undivided moiety of the premises claimed by the mortgagee to C. Brown. But he denies that Brown ever paid to the administratrix $15,500, the consideration mentioned in the deed, or any other sum for his purchase, although he stipulated to pay her a certain sum, and paid her in part for her dower interest.

As to the other undivided moiety, he has never seen the bond, and is ignorant whether the same was in fact executed by his ancestor, and if it was, what were the terms, and conditions which were to be performed by Brown, and whether performed or not, and submits that these facts must be

proved by him, before he can derive any benefit from the bond.

Admits that Brown, in 1824, claiming under the said supposed bond, and under the deed made under the act aforesaid, took possession of the land, and executed the mortgage, and the other conveyance mentioned in the bill, but denies that the mortgage in any manner affected his title, which vested in him by descent.

That O. Holman, the elder, and Brown were partners in trade, in the course of which they had contracted debts to a considerable amount, many of which are still unsettled. That the said Brown had always resided at Boston, and as surviving partner took possession of the assets, and persuaded the administratrix to let him have the control of the individual assets; representing that from the rents he could pay off the debts, and would then reconvey the land to her, and her family. That she consented, and agreed, that the application should be made to the Alabama legislature for power to sell the land.

That after the conveyance was so made by the administratrix, to Brown, he mortgaged the whole estate to certain persons, upon a loan of $20,000, and the administratrix received from Brown a stipulation in writing, by which he bound himself to reconvey the half so sold; that when the mortgage was discharged, he would reconvey the said real estate. Yet, although satisfied from the rents, and profits, he did not convey either to the heirs, or the administratrix, or render her any account of the same, and suddenly left the United States, having conveyed away the whole of said property to other persons. He denies his responsibility to account; insists that the bill is multifarious, because it seeks to foreclose, and sell the premises, as against all the defendants, and calls on the administratrix, and heirs of Holman to execute deeds, and render an account, in which the other defendants have no interest. He also demurred to the bill.

Agnes Howard, a minor, answered by her guardian *ad litem*, putting the complainant on proof. Other defendants answered the bill, and the bill was taken as confessed as to the rest. Those who answered, deny the right of complain-

Heirs of Holman, et al. v. Bank of Norfolk.

ant under the mortgage, and call for proof ; they also demur to the bill.

Morrell, in his answer, states, that previous to his purchase, he called on the bank, and the bank disclaimed all interest in the premises, whereupon he completed his purchase, and insists that the suit the bank is now prosecuting, is for the benefit of Copeland. He denies also the validity of the conveyance from O. Holman, the elder, to Brown, and states his belief, that the whole debt due the bank, has been paid. He disclaims all interest in this controversy, having sold by quit claim deeds, and demurs to the bill.

Leave was given to examine Morrell as a witness, subject to all legal objections.

Sarah Holman, by a supplemental answer, admitted she had conveyed her dower interest to Charles Brown.

A great mass of testimony was taken, which, so far as it is important, will be found in a condensed form, in the opinion of the court. The cause coming on to be heard at the April term, 1846, the chancellor overruled the exceptions taken to the complainant's testimony, and sustained those taken to the testimony of the defendant, and decreed, that the premises contained in the mortgage, were subject to the mortgage debt, except the portions conveyed to Remsen & Jude, and to Sheffield & Barney. He further decreed, that the bond of O. Holman, to C. Brown, which was proved as an exhibit, was valid, and that the heirs of Holman be perpetually enjoined from asserting any claim to the same, as against the bank. He further decreed, that the conveyance from Sarah Holman, to C. Brown, under the act of the legislature, was a valid, operative, conveyance, and the estate of the heirs of Holman therein divested. He further referred the matter to the master, to take an account of what was due the bank, and to determine the order in which the premises should be sold. From this decree an appeal was allowed, which by consent was prosecuted pending the account.

The appellants assign for error—

1. In overruling the demurrer to the bill.

2. The court had no jurisdiction.

3. It had not jurisdiction of the non-resident defendants.

48

4. The necessary parties are not before the court.

5. In decreeing against the minor defendants.

6. In declaring the property subject to the mortgage.

7. In sustaining the bill against the heirs of Holman.

8. In sustaining the complainant's objection to the defendants testimony.

9. In overruling the objection to the defendant's testimony.

10. In declaring the mortgage a *lien*, when its satisfaction was shown by the proof.

ADAMS & SEWALL, for appellants, argued the cause at great length, but no note was preserved of it. HOPKINS, on the same side—

The complainant claims the specific performance of a covenant made by O. Holman, deceased, in favor of Brown, his mortgagor; if such a decree should be made, the title to half the real estate in controversy would be divested out of the heirs of O. Holman, and vested in the complainant.

There is no allegation in the bill, that Brown gave any consideration for the alledged covenant to O. Holman. The answer of Holman, the heir, does not admit, but denies that any consideration was paid, or agreed to be paid, to his father, for the covenant. The covenant therefore, is within the statute of frauds, because one term of a valid agreement, the price or consideration, is not contained in the covenant. A specific performance of a written agreement for the sale of real estate which does not contain the price, cannot be decreed, because it does not contain, as the statute of frauds requires, the whole agreement, and is therefore void under that statute. [2 Story's Eq. 22, § 715; 53, § 751; 54, 60; 69, § 767; 76; Adams v. McMillian, Ex'r, 7 Porter's Rep. 73, 83, 84; 12 Vesey, 469; Blagden v. Bradbear, 3 Bingham's R. 107; Morely v. Boothby, 1 Eng. Com. Law Rep. 53, 56; 11 Pick. Rep. 439; Brooks v. Wheelock, Story's Eq. Pl. § 503; Cooper's Eq. Pl. 166, 167; 1 Johns. Ch. Rep. 274; Parkhurst v. Van Courtlant, 6 Gill & Johns. 439, 440; Griffith v. Frederick C'ty Bank; Newland on Contracts, 307 to 310; Bligh Rep. 49, 50; 4 Pick. Rep. 1; 40 Law Lib. 48; Kennedy v. Lee, 3 Meriv. 440.]

The object of the statute of frauds is to prevent perjury. To attain this object it is more necessary to require that the consideration of an agreement should appear in writing than any other term or condition of the agreement. [3 Bingham's Rep. 107; 11 Eng. Com. L. Rep. 56; 7 Porter's Rep. 83; 1 Chitty's Prac. 118, 293, 827, 828.]

If the bill, for the purpose of aiding the defective written agreement, had stated there was a consideration, and the amount of it, and had shown also that the amount of the consideration was no part of the agreement, but could be proved by oral evidence, the court would have no authority to decree a specific performance. / If the written agreement had stated that it was upon a valuable consideration paid by Brown to O. Holman, without stating the amount of it, the agreement could not be enforced in equity, as oral evidence would not be competent to prove the amount of the consideration. [11 Eng. Com. L. Rep. 56; 7 Porter's Rep. 83-4.] If a consideration could be implied, because the agreement is contained in a covenant, the consideration implied from the written agreement is uncertain in amount, and oral evidence is no more competent to prove the amount, than it would be to prove the amount of a consideration stated in a written agreement, but the amount of which consideration was not expressed.

If the consideration, and the amount of it, had been stated in the bill, as these things do not appear in the written agreement, they could not be proved by oral evidence, as they are not admitted by the heirs of O. Holman, in their answer. [2 Story's Eq. 76.] If such allegation had been made and admitted, the complainant would not be entitled to a specific performance of the agreement, as the statute of frauds is insisted on by the heirs. [Ib. 60.] The covenant, as an exhibit, forms part of the bill, and it may therefore be contended, that there is an implied consideration shown by the bill, but the amount of such consideration is not stated in the bill. If, therefore, oral evidence of the amount of the consideration were competent, instead of being incompetent, and the amount of the consideration had been proved by oral evidence, or the answer of the defendants, the complainant could have no relief founded upon such evidence, or ad-

mission, because the amount of the consideration is not alledged in the bill, and a complainant is no better entitled to relief upon evidence, without a material allegation in the bill, to be proved by such evidence, than on such an allegation in the bill without proof of it. [3 Porter's Rep. 473; Morgan, Ex'r, v. Crabb, 10 Wheat. 189; 3 Littel's Rep. 339; 3 Ala. R. 718; Borland v. Phillips, Story's Eq. Pl. $ 264.]

The authority of the court to decree a specific performance is discretionary, and independently of the statute of frauds, equity requires a complainant to entitle himself to a specific performance, to alledge and prove an adequate consideration for the agreement. That it may appear to the court to be adequate, the amount must be stated in the bill. [2 Story's Eq. 54, 64; 11 English Com. L. Rep. 56; 2 Ala. R. 86; Gould v. Womack and wife, 3 Cowen, 445; Moore v. Delancey, 6 Johns. Ch. Rep. 225; 2 Bibb, 78; 4 Johns. Ch. Rep. 500; 3 Bibb, 29.] The amount of the consideration was neither stated in the bill, nor proved upon the hearing. [7 Porter's Rep. 83.]

As the right to a specific performance depends upon the adequacy of the consideration, the amount of it, to show the court that it is adequate, is a material allegation in the bill, and as the agreement is in writing, without a statement in it of the consideration, and the amount of it, oral evidence would be incompetent to supply the omitted statement. Independently of the effect of the statute of frauds upon the covenant, the law of evidence would exclude parol evidence to prove an essential term, the consideration of the agreement, as the effect of such evidence, if it were admitted, would be, to add to the written agreement. [11 Eng. Com. Law Rep. 56; 7 Porter's Rep. 84.]

In an action at law upon a bond, the rules of pleading do not require the amount of consideration to be stated. In declaring upon a bond, the consideration is in effect stated in the declaration, as the fact, the sealing of the instrument, is stated, from which the law would imply a consideration. Since the existence of the statute law, which makes any written instrument, without seal, *prima facie* evidence of the debt or duty, for which it was given, the same rule applies

Heirs of Holman, et al. v. Bank of Norfolk.

to the declaration, and a consideration is in effect stated, by declaring upon an instrument which import a consideration.

As a valuable consideration, regardless of its amount and adequacy, is sufficient to maintain an action at law, upon any of these instruments, the statement in a declaration of a bond or note, either of which imports a valuable consideration, is an averment of all the consideration which the rules of pleading require in a declaration. The statute of frauds has not changed the rules of pleading. It is still sufficient to declare upon a bond, or a promise in writing, to show in the declaration such a consideration as the rules of law require. But although the amount of the consideration which the bond or note imports, need not be stated in the declaration, yet, since the statute of frauds, there can be no recovery at law, upon a written agreement for the sale of lands, in which the price is omitted, where the statute is pleaded. The defect in the plaintiff's evidence, in such a case, would prevent a recovery. [7 Porter's Rep. 83, 84, 86 ] 11 Eng. Com. Law Rep. 56.]

But the rules of pleading in equity require that every material fact of which the case of the complainant consists, should be alledged in the bill. There can be no proof heard of a fact which is not alledged. Before the statute of frauds, as well as since, equity, would not decree a specific performance of the contract, unless not only a valuable, but an adequate consideration for it were alledged in the bill. It could not appear to the court to be adequate, unless the amount of it were stated in the bill. Since the statute of frauds, the amount of the consideration, as well as every other term of the contract, must be in writing. If the written contract omits the amount of the consideration, the defect cannot be supplied by parol evidence. The covenant of Holman to Brown is an exhibit to the bill, and is therefore a part of it. The covenant contains no statement of the amount of the consideration. The bill therefore shows no right to a specific performance. There is not parol proof in this case, that the consideration of the covenant was adequate. There is no other proof of consideration than what the covenant imports, and the covenant itself was not proved by competent evidence. Belief is a state of mind produced by evidence, and

the belief of the witness, that the subscribing witnesses to the covenant, resided in Massachusetts, without stating any fact which caused the belief, is not evidence of the non-residence of the subscribing witnesses. In actions at law, not founded upon any written instrument, the consideration must be fully stated in the declaration. If any part of a consideration, consisting of several things, be omitted in the declaration, the plaintiff will fail upon the trial, on the ground of variance. [1 Chitty's Pl. 293, 294.] In relation to written instruments, which are neither bonds, negotiable notes, nor bills of exchange, the rule just mentioned has been changed by the act of 1811, and the rule of the common law applicable to declarations on bonds, notes and bills, which import a consideration adopted for declarations on instruments, that did not import a consideration at common law. The rule of pleading in equity, in cases like this, has always required an allegation of the full consideration of any instrument, sealed or unsealed.

The averments in a declarations must be supported by proof. If a sealed instrument be declared on as such, if the plea put it in issue, or oyer be craved, and it be set out upon the record, and have no seal, the plaintiff must fail upon a demurrer. If the cause of action be on a verbal contract, the plaintiff must aver the full consideration, and prove it upon trial, if it be denied by the plea. For a specific performance, equity requires an adequate consideration. The amount of it is therefore a most material allegation in the bill, as there is no case where a decree for a specific performance can be had, upon mere proof that there was a valuable consideration. It must be proved also, that the consideration was adequate. But in actions at law, upon written instruments, the plaintiff can recover, if the consideration be not impeached, by a plea upon the mere proof of valuable consideration, which such instruments import.

The complainant neither alledges any amount as the consideration of the covenant, nor proves any, to show the court that an adequate consideration was given, by Brown, for the covenant.

Upon the principle heretofore stated, it is necessary to alledge a consideration, and the amount of it, in a bill for a spe-

cific performance ; but if this had been an action at law, and a consideration had been denied by plea, and the statements in a plea, when responsive to a declaration, were evidence, as an answer responsive to a bill is, the statement of a consideration by stating an instrument which imports a consideration, would be disproved by a plea denying a consideration. In this case, the consideration stated in effect, in the bill, as it may be contended by stating the covenant, which imports a consideration, is denied by the answer of Holman, which is responsive to the bill, and is sworn to, against the denial of the answer, there is no other evidence than the covenant. The evidence of consideration which the covenant imports, is put in issue, and disproved by the answer.

In the case of Adams v. McMillan, ex'r, 7 Porter, 73, 83-4-5-6, this court determined, that an agreement in writing, for the sale of land, which imports a consideration, under the statute law—but in which the price was omitted, is void at law, when the statute of frauds is pleaded. That statute is pleaded in this case. [For the English statute of frauds, see Roberts on Frauds, 125, and for the statute of frauds of Alabama, see Aik. Dig. 206.]

The amended answer of Holman states, that if any consideration were given to O. Holman for his covenant, it was the obligation of Brown to perform the covenants undertaken by him, in an agreement of the same date of O. Holman's covenant, between O. Holman and himself, which is an exhibit to the supplemental answer of Holman. The agreement was not proved, as the depositions which had been taken to prove it, were excluded upon the motion of the complainant. The amended answer states that none of the covenants entered into by Brown were performed by him. If this answer were responsive to the bill, it would-be taken altogether, and show that no consideration was given for the covenant, which forms part of the bill, as the covenants of Brown in the other agreement, the performance of which was to be the consideration of the covenant of O. Holman, have not been performed. But the agreement referred to by the amended answer of O. Holman, is not alledged in the bill, as the consideration of the covenant set up in the bill. If therefore, the performance by Brown of his covenants contained in the agreement,

had been proved, or admitted, in the supplemental answer, the complainant could take nothing from such proof, or admission, because such covenants, and the performance of them by Brown, as the *consideration of the covenant of* O. Holman, are not alledged in the bill. [Story's Eq. Pl. § 264; 3 Porter's Rep. 473; 10 Wheat. Rep. 189; 3 Ala. R. 718.]

The anewer of Agness Howard, the other heir at law of O. Holman, does not set up any agreement between him and Brown.

If the covenant were a valid agreement within the statute of frauds, the specific performance of it is barred, both by the lapse of time and the statute of limitations.

There is no allegation in the bill that there was a partnership between O. Holman and Brown; none that the firm of Holman & Brown was insolvent, or that the estate of Holman was insolvent. There is no statement in the bill that the act of the legislature of Alabama, under which the agents of O. Holman's widow sold the other half the real estate, required her or them to do any thing to give them authority to sell the real estate of O. Holman. If all these things had been proved, the evidence would be without the effect of proof, in favor of the complainant, and give no right to a decree against Holman's heirs. It is not alledged in the bill, that the agents of Mrs. Holman made any bond, with sureties, before they sold the real estate under the act of the legislature. Yet the chancellor erroneously admitted upon the hearing, proof against the objection of the defendants, that the agents did give their bond with sureties, as the act required, before the sale. [Story's Eq. Pl. § 264; 3 Porter, 478; 10 Wheat. 189; 3 Ala. Rep. 718.]

Upon the death of O. Holman, his real estate in Alabama descended to his heirs at law, and they could not be divested of it, according to the laws of this State, when the descent was cast upon them, without a judgment, or decree, in a judicial proceeding, in which they would have a right to be heard in support of their claim to the estate. [4 Ala. Rep. 681, 682; Lucas v. Price, ———, 752; Mansony & Hurtel v. The United States Bank, 5 Ala. Rep. 324; Cummins & Cooper v. McCulloch, Id. 503; Fitzpatrick, et als. v. B. & W. Edgar, 8 Porter, 389, 401.]

The act of the legislature, under which the sale was made, was unconstitutional and void, because it attempted to give, in effect, authority to third persons, to ascertain that debts were due from O. Holman, deceased, for which the real estate that had descended upon his heirs, was liable, and to sell it for the payment of any creditor Mrs. Holman might prefer. [4 New Hampshire Rep. 572-3; 10 Yerger's Rep. 69; 1 Gill & Johns. 463, 475; Crane v. McGennis.]

Mrs. Holman never was a personal representative of O. Holman, under the authority of Alabama. She did not reside in this State, but was a citizen of Massachusetts. The bill does not alledge by what State she was appointed administratrix. If it should be held, that the effect of the bill is to show, she was appointed by the authority of Alabama, the answer of Holman denies the appointment by this State, and alledges she was appointed by Massachusetts. The proof of the complainant shows she was appointed by the authority of Massachusetts only. The act of the legislature of Alabama did not appoint her administratrix, but described her as an existing administratrix. The real estate in Alabama did not constitute assets in the hands of the Massachusetts administratrix. [9 Mass. Rep. 395; 8 Porter's Rep. 401-2.] If Mrs. Holman had come into this State, she could not have been sued as administratrix. [Story's Confl. Laws, 421-2.] She was not liable, therefore, for the proceeds of the sale of the real estate in Alabama, to the authority of Massachusetts, nor to the authority of Alabama, as she is not an administratrix appointed by Alabama. She gave no bond, nor was she required to do so by the act, to account to the authorities of this State, for the proper application of the proceeds of the sale. Her agents were required by the act, to give a bond before the sale, to pay the proceeds of it to Mrs. Holman, a non-resident of Alabama, and a citizen of another State.

The personal property of the intestate, is the fund, in this State, which is first chargeable with his debts. [Aik. Dig. 151; 3 Stew. & Porter's Rep. 27; 3 Porter R. 10, 31, 38; 3 Ala. Rep. 61, 64; 2 Ala. Rep. 660.]

The real estate descended to Holman's heirs, subject to the power in the orphans' court of the county in which it lay, to

49

order a sale of it in the following cases: 1. Where the estate of the intestate was insolvent. 2. Where the personal property was insufficient to pay his debts. 3. Where it would be more beneficial to the heirs, to sell real estate than personal property, for the payment of the debts. 4. Where the real estate could not be beneficially divided among the heirs. In the three last cases, all persons *interested*, are required by the statute law, to be made parties, actually, to the proceeding. The case first mentioned, is a proceeding *in rem*, to which all interested are legally parties, and may become actually so. [2 Howard's Rep. 338; 6 Porter's Rep. 219, Wyman and others v. Campbell and others; Aik. Dig. 154, § 8; 156, § 17; 180, § 16; Clay's Dig. 192, § 2; 225, § 23, 25.]

The source of the authority of an orphans' court to order a sale of real estate, is in the statute law, and the judgment of such court, formed upon competent evidence, that one of the cases exists, in which it is authorized to decree a sale.

The exercise of this power by an orphans' court, is no greater interference with the inheritance, than that which is exercised by a court of chancery, when it decrees a sale of real estate, that an ancestor had mortgaged, which had descended to his heirs. Such power is exercised upon the judgment of the court, that there is an unpaid debt, and that the mortgage was made to secure it. If such a mortgage were made to secure several debts, and every one that the mortgagor owed at the time of his death, this fact would not authorize the legislature to pass an act, giving authority to a citizen of another State, or the administrator appointed by Alabama, to sell the mortgaged premises and pay the debts. The petition of the mortgagees for such an act, could give no validity to it. The title of the heirs could only be divested in some mode in which the object could be accomplished by the exercise of judicial power. The power to divest the heir of the title, which descended upon him, belongs to the proper court, and must be exercised upon its judgment, in a proceeding in which the heir may have an opportunity of being heard, that there is a debt due from the mortgagor, for which the estate is liable in the hands of the heir. [4 Ala. R. 752; 1 Ib. 725-6.]

If there had been a judgment in some court in this State against O. Holman, at the time of his death, an execution issued upon it after his death, would have been void, and a purchaser under it, would have acquired no title against his heirs. [4 Ala. Rep. 752, 681.]

The lien of such a judgment, might be preserved by suing out a *scire facias* upon the judgment, against the heir, and personal representative of the deceased debtor, before the personal representative had reported the estate insolvent. A report of the estate of a deceased debtor as insolvent, by his executor or administrator, before a judgment creditor sues out a *scire facias* against the heir and personal representative of the debtor, destroys the lien of such judgment. Such a report, by operation of law, divests the estate out of the heirs at law, and vests it in the personal representative for the purpose of equal distribution. [Fitzpatrick and others *v.* B. & W. Ogden, 5 Ala. Rep. 499, 503.]

The personal property of a deceased debtor is, according to the law of Alabama, the appropriate fund for the payment of his debts, and when it is insufficient to pay them all, the personal representative may, and ought to report the estate insolvent. [Woods v. McCann & Witherspoon, adm'rs, 3 Ala. Rep. 61, 64.]

When the inheritance is cast upon the heirs unincumbered by any specific lien, created by the ancestor, as by a mortgage, their title to it can be divested to pay the debts of their ancestor, upon the application only of his personal representative, and the order of the proper orphans' court to sell it. The personal representative has no right to apply for such an order, but in virtue of a previous report by him of the estate as insolvent. [3 Ala. Rep. 64; 4 Ala. Rep. 682.] In such a proceeding, the title remains in the heirs, after an order for a sale, until the court decrees a title to be made to the purchaser, and a title is in fact made. [Cummings & Cooper v. McCullough, adm'rx, 5 Ala. Rep. 324.] It is the settled law of Alabama, that the title of the heirs cannot be sold and transferred to purchasers, for the purpose of paying the debts of their ancestor, without a decree of the proper orphans' court, directing the sale of it, and to the proceedings in which such a decree may be rendered, the heirs are constructively,

or actually parties, and therefore cannot be divested of their title without a judicial proceeding, and an opportunity of being heard, as this court decided in the case of Mansony & Hurtell v. The U. S. Bank, 4 Ala. Rep. 752.

The death of the ancestor transfers the title, by operation of law, to third persons, as a deed conveying the fee from a grantor to grantees does. Against the latter, liens existing against the estate, at the time of the conveyance, in mortgages made by the grantor, or unpaid purchase money due from him, of which his grantees had notice, cannot be enforced without the exercise of judicial power, in the proper proceeding, to which the grantees must be parties, and may have an opportunity of being heard. If the legislature, without any knowledge of the number, nature or amount of these different liens, were to pass a law, upon the application of a person who claimed no interest in the matter, authorizing such person to sell the estate, and apply the proceeds of the sale to the payment of the debts of the grantor, who would attempt to maintain the validity and constitutionality of such a statute, or that the title of the grantees had been divested or impaired by the sale? No validity could be acquired for such a statute by proof that the legislature acted in passing it, upon evidence that unsatisfied liens existed against the grantor, at the time of his conveyance, to more than the value of the estate. A sale under such a statute would be liable to several fatal objections. It would be without the support of a judgment, or decree of a court of competent jurisdiction, which authorized it, after ascertaining the existence and amount of the liens, in a proceeding to which the grantor and grantees were parties. The validity and amount of the liens would be determined by the private judgment of the legislative agent. In the distribution of the proceeds of the sale, he might reject valid liens, and allow groundless or satisfied claims, and from his judgment there could be no appeal. The title of the heirs was as completely and firmly vested in them by the death of their father, the intestate, as any title can be in a grantee by the conveyance under which he claims. There were no mortgages on the inheritance made by O. Holman. There were no judgments against him, nor other specific liens upon the estate when the de-

scent of it was cast.   If O. Holman left creditors at large,
their demand could not affect the real estate in the posses-
sion of the new owners, the heirs at law, who did not owe
the debts, without the judgment of the proper orphans' court,
at the suit either of the personal representative of Holman, in
the mode which has been already noticed, or of some credi-
tor, under the act of 1828.   [Aik. Dig. 156, § 17.]   The act
under which the sale in this case was made, directs the pro-
ceeds of the sale to be applied to the payment of the debts
due from O. Holman, the ancestor.   The act does not affirm
that the personal property of O. Holman was insolvent, that
it was necessary to sell the real estate, in aid of a personal
property insufficient to pay the debts, or that it would be
more beneficial to the heirs to sell the real estate than the
personal property, for the payment of the debts.   The act,
therefore, does not show the existence of any case in which
even the proper orphans' court could have decreed the estate
to be sold.   The act, in the absence of any person who
claimed to be a creditor of O. Holman, deceased, of his heirs,
and of any personal representative appointed by Alabama, in-
sinuated that debts might be due from O. Holman, and left
it to an individual who was a citizen of another State, to de-
termine whether debts were due from a former owner of the
estate.   If it did not appear to that individual that such
debts were due, there would be no authority to sell the es-
tate, as it could be sold under the act only to pay such debts.
It was therefore left to the legislative agent to determine
whether such debts were due, and if in her judgment debts
were due, she was authorized to have the estate sold, and ap-
ply the proceeds to the payment of such claims as she allow-
ed.   From her judgment, rejecting or admitting claims, as
debts, there could be no appeal.   The act intended, that the
title of persons who owed no debts, should be sold by an in-
dividual upon her private judgment, that debts were due from
a former owner of the same estate, and the proceeds applied
to the payment of such of the creditors of the former propri-
etor as she might recognize.   The evidence shows the sale
was made to Brown, who paid no money, as the act required.

The debts of the ancestor not in judgment against him at
the time of his death, cannot be charged upon the real estate

which descends upon his heirs, till the proper orphans' court approves of a report made by the personal representative, that the personal estate is insolvent, and such a report he is authorized to make, if the personal property be insufficient to pay the debts. [3 Ala. Rep. 61; 4 Ib. 681-2, 752; 5 Ib. 324, 503.]

The approved report divests the heirs of the title, and vests it in the personal representative, to pay the debts. After the report shall be approved, all the debts must be presented, and the amount of each ascertained, under the authority of the proper orphans' court in Alabama. The title of heirs to real estate in Alabama cannot be divested, but upon a report of the estate as insolvent, made by a personal representative, appointed by the authority of Alabama. A foreign executor or administrator, has no authority to report an estate insolvent, to an orphans' court in Alabama, and obtain an order to sell real estate. For the extent of his authority, and the terms upon which he can obtain it, see Clay's Dig. 227, § 31. A report of insolvency divests the title of the heirs, not absolutely. Should it turn out that the real estate is not absolutely needed for the payment of the debts, the title will be restored, by operation of law to the heirs. After the report of insolvency, the personal representative cannot sell the estate without the authority of the proper orphans' court. It would be a violation of his duty, to pay afterwards a debt alledged to be due from the ancestor, which had not been allowed under the authority of the orphans' court. He succeeds to the personal property upon the death of the ancestor, and before such a report, he has a right to determine that a claim is a just demand, and pay it out of the personal property; but he has no authority to pay debts upon his own judgment that they are just, out of the proceeds of the sale of real estate. He can pay out of such proceeds such debts only as may be admitted to be just by the authority of the orphans' court. The report makes the personal representative a trustee of the real estate—first for the creditors, who may be recognized as such by the orphans' court, and next for the heirs. This trust fund cannot be employed in the payment of debts, but upon a judicial proceeding, to which the creditor is an actual party, by presenting his claim to the

proper court, to which the trustee is an actual party, and to which the heirs are constructively and legally, and may become actual parties.

The heirs acquired from descent such a vested estate as their ancestor had. A debt of their ancestor can no more affect their title than a debt of their own, without a judgment or decree of some judicial tribunal. If one acquires an estate by purchase from another, which was incumbered by a mortgage, the title of the purchaser could not be divested without a decree of the court for the mortgage debt. The estate of the ancestor was liable for his debts while he lived, but the liability could be ascertained and enforced by the judgment of a court of competent jurisdiction only, and a law authorizing a person who was no agent of his, to sell the estate and pay such claims as the legislative agent might determine to be just debts, would be unconstitutional and void. The administratrix appointed by the authority of Massachusetts was not the personal representative of O. Holman in Alabama, who could report his estate insolvent, divest the heirs of their title, and become a trustee of them, and of such other persons as might be recognized by the orphans' court as creditors of O. Holman. The act of the legislature authorized one who could not become by operation of law, a trustee of real estate in Alabama for creditors and the heirs, to sell the real estate of the heirs upon her opinion that debts were due. In the exercise of the judgment of the legislative agent, the just demands of creditors might be defeated. In a proper proceeding, according to the laws of Alabama, a personal representative, as a trustee of the real estate, could pay no debt out of the proceeds of the sale of it, which had not been decided under the authority of the orphans' court to be due, and would be bound to pay all such debts rateably. Under the act, the agent might pay one and reject another, or pay what was not legally a debt, to the exclusion of just debts. She is not responsible for her acts, under the statute, to the authorities of Alabama. The trust, therefore, for creditors, created by law, and subject to which the real estate descended, was annulled by the act, and the vested rights of the heirs, and the constitutional jurisdiction of the courts of our own State, were conferred by it upon an individual, a re-

sident of another State.   A citizen of Massachusetts was vested by the act, with the exclusive authority, so far as the real estate in Alabama could be charged with debts of the ancestor, to determine whether he owed debts, and the amount of them, and if in her private judgment debts were due, she was authorized to sell the estate for the payment of the debts.  The courts were deprived in the case, if the act be valid, of the power which belongs to them in every other case, of determining whether debts were due from one person, which bind the estate of another person.   If the act authorized any other citizen of Massachusetts, by his agents here to sell the real estate, and required the agents to give bond, with sureties, for the payment of the proceeds to him, would any one attempt to maintain the validity of the act ?   There is no difference between the actual and the supposed case.   The legislature was as destitute of power to confer the authority upon the administratrix appointed by Massachusetts, as upon any other citizen of that State.

The supreme court of the United States, in the case of Watkins v. Holman, 16 Peters, 61-2-3, decided that the act of the legislature of Alabama, under which half the real estate in controversy was sold, was valid.   The court denied that the estate was so vested in the heirs, by the descent of it upon them, that they could not be divested of it without a judgment, or decree, in some judicial proceeding, in which they could be heard in support of their claim to the estate.   This court maintained the doctrine which that court rejected as unsound.   [4 Ala. R. 752.]   That court held, that the principle upon which the validity of a sale of real estate made by an order of the orphans' court rests, was a sufficient authority for the act.   It would seem that the supreme court of the United States did not consider an order of the orphans' court to sell real estate, under the laws of Alabama, as a decree rendered in a proceeding *in rem*, to which the heirs are legally, and may be actually parties.   The supreme court of this State holds the proceeding to be one *in rem*.   [6 Porter's Rep. 219.]   That court said that the legislature has power to authorize an administrator, by a general law, to sell lands where the personal assets are exhausted, without any application to the court.   If a descent were cast after the enact-

Heirs of Holman, et al. v. Bank of Norfolk.

ment of so extraordinary a law as the one supposed by the supreme court of the United States, the validity of such an act would seem to be very questionable, as it would confer authority upon an individual, without any judicial power in Alabama, to determine that the primary fund for the payment of the debts had been exhausted, that claims set up against the ancestor were just debts, and binding upon the estate of other persons who were his heirs. No reason is perceived why power could thus be constitutionally exercised by a mere individual, to determine the validity and amount of debts claimed to have existed against the ancestor, at the time of his death, which no one would concede to the same person acting under a statute, authorizing him to ascertain the validity and amount of the debts of a living citizen, and without the approval, by the alledged debtor, of the debts recognized by the legislative agent, and against his consent, sell his real estate for the payment of his debts. But no such act existed when the title of the heirs was vested in them by the descent which was cast upon them. If before the death of the ancestor, the statute law of the State had authorized the issuance of an execution after his death, upon a judgment which was rendered against him in his lifetime, and the sale of the inheritance to satisfy the execution, such a sale might be valid. The validity and amount of the debt had been established against the ancestor, by judicial authority, and the heir would take the inheritance incumbered by the legal lien of the judgment. There is no such statute law of this State, and this court has determined that an execution issued after the death of the ancestor, upon a judgment recovered against him while he was alive, is a nullity, and from a sale under it, a purchaser cannot acquire any interest in the land. [4 Ala. R. 752.]

The Supreme Court of the United States said, it was the policy of Alabama to apply the real estate of a deceased person in payment of his debts. It is the policy of the State, in the event only, that his personal property is insufficient for the purpose. It is the settled policy of the State also, to subject, by the exercise of her judicial power, the real estate of living persons to the payment of their debts, but this poli-

50

cy has never been looked to as a source of legislative power, to appoint an agent to sell the real estate of a living person, and with the proceeds of the sale pay such debts as it may appear to the agent such person owes.

According to the laws of Alabama, the indorser of a note not negotiable, although for the payment of money, is not liable for the debt till after the insolvency of the maker shall have been ascertained by the return of *nulla bona*, to an execution against him, issued upon a judgment obtained in a suit commenced within the time prescribed by the statute law. If the indorser of such a note were to make a mortgage upon real estate to secure the payment of the debt, in the event that the indorsee and mortgagee should take the necessary steps to render the mortgagor liable, the estate mortgaged would not be liable upon the mortgage, in the hands of a subsequent purchaser before the *primary fund* for the payment of the note—the property of the maker, had been exhausted. To foreclose the mortgage, the amount due upon the note, the commencement of the suit against the maker in proper time, and the insolvency of the maker must be proved. Two of these facts could be proved only by records made in the exercise of judicial power. An act of the legislature which should appoint any person an agent to sell the estate and discharge the alledged liability of the mortgagor, for which the act declared that the estate was bound by the mortgage, would deprive the courts of their constitutional power to decide the questions, whether the suit had been brought against the maker within the time prescribed by law, how much was due upon the note, and whether also the primary fund for the payment of it had been ascertained by the return of *nulla bona* to an execution against the maker to be exhausted? Such an act would deprive the purchaser of the estate of his constitutional right to have these questions determined by the judicial tribunals of the State, and refer them all to the private judgment of an individual, who was in possession of no judicial authority derived from the constitution. Such an act would be a striking violation of the constitution of the State, but if it were enacted without the application of the creditor, it would be a wanton violation of that instrument, as well as of the fundamental principles of

justice. According to the law of this State, as settled by the judgments of this court, the title of the estate in controversy was as firmly vested in the heirs of O. Holman, before the passage of the act of the legislature, as the title could be in the purchaser in the case I have put. The personal property of their father was the primary fund for the payment of his debts. That must be insufficient for the purpose, and ascertained to be so, upon the report of the personal representative, that the estate was insolvent, and by the approval of the report by the proper orphans' court before any one could acquire a right to resort to the ultimate fund for the payment of the debts—the real estate which had descended to the heirs. This right could be acquired only by the personal representative. In the exercise of it he could not pay debts, on his own judgment that they were due. The debts to be paid out of the proceeds of the real estate must be determined by the authority of the orphans' court to be due. The orphans' court would allow no debts as a charge upon the estate, which had not either been presented to the personal representative, within the time prescribed by the statute law, or filed within the period directed, in the orphans' court. A judgment for a debt against the personal representative, would be no evidence againstt the heirs that it was a debt. and a charge upon their estate. [3 Porter's R. 10, 31, 38.] When an administrator petitions the county court for leave to sell the lands, on the ground the personal estate is insufficient, the heirs may show the debts are barred by the statute of limitations, and are therefore no charge on the real estate. [Heirs of Bond v. Smith, adm'r, &c., 2 Ala. Rep. 660.]

The failure of the personal representative to prevent the judgment by the plea of the statute of limitations, or of non-claim, would not deprive the heirs of their right to discharge their estate from the demand, by urging the operation of either statute against the claim. [3 Porter's Rep. 39 ; 4 Con. Eng. Ch. Rep. 461.]

The determination of all these judicial questions, was either rendered unnecessary, or referred by the act of the legislature to an individual, without judicial authority, and upon whom the legislature was incompetent to confer such authority, without a change in the constitution, making females eligible

as judges, and electing Mrs. Holman a judge of a court possessing jurisdiction of such questions. The legislative agent, appointed without an application from creditors, was authorized to determine that claims were binding debts against the estate of third persons, which, by law, was a fund only for the payment of debts after the personal property had been exhausted. The agent was authorized to sell the real estate, regardless of the sufficiency of the personal property to pay the debts. Such authority could not be constitutionally conferred upon an administrator appointed by this State, unless he were a judge also of the proper orphans' court. The authority would belong to him then as a judge, and he could not exercise it in a case in which he was an administrator. The constitution of Alabama prohibits the legislative department of the government from exercising judicial power, and the courts from the exercise of legislative power. No power can be both legislative and judicial. If the act be valid, it was passed in the exercise of legislative power, and the acts which confer the jurisdiction which has been mentioned, upon the orphans' courts, are unconstitutional and void. [Aik. Dig. 31, § 1, 2.]

The agreement between Brown and Mrs. Holman, that the passage of the act should be procured, that the conveyance to him should be made under it, without the payment of any purchase money, and in the event specified, one half the estate should be conveyed by him to her, was fraudulent, and a court of equity will enforce no claim set up under the act. [16 Peters, 63, Watkins v. Holman and another.] Nothing appears to show whether Mrs. Holman has been called upon to pay individual debts of O. Holman. The real estate was his individual property, and applicable to the payment of his debts, if he owed such. Yet if Brown has paid any debts in consequence of receiving the conveyance from Mrs. Holman, they were debts of the firm.

As no purchase money was paid upon the sale under this act, there was no authority to make the conveyance to Brown. The sale authorized by the act is not like a proceeding *in rem* in a court. [10 Peters, 175; 6 Peters, 245; 2 Stew. R. 333; Sugden on Powers, 364; Clay's Dig. act of 1806, 225, § 20, 23; 4 Johns. Ch. Rep. 175; 6 Conn. Rep. 387.]

In the case of Watkins v. Holman and others, which the supreme court of the United States decided, it was proved that the estate of Holman was insolvent. In this case there is no such evidence.

As the supreme court of the United States, in construing the statute, or local laws of Alabama, is bound to adopt and abide by the construction put upon such laws by the supreme court of this state, that court would, doubtless, in another case, in which the validity of the act was questioned, and the judgments of this court should be produced, hold the act to be unconstitutional, and the sale under it void. [16 Peters, 18.]

As the amount of the mortgage debt had not been ascertained by a judgment, or decree, of some court before the bill was filed for a specific performance, against the heirs of O. Holman, the court had no authority to decree a specific performance. [6 Gill and Johns. 437; Griffith v. the Frederick C'ty Bank.]

Sheffield & Barney are jointly interested with the complainant in any decree for the specific performance of O. Holman's covenant, that may be made. They hold under Brown, and by the release of the complainant, as the bill states, and to the part of the estate they hold, they can acquire no legal title without a decree for a specific performance. They are indispensable parties to the bill. [Story's Eq. Pl. § 72, 82, 83, 709.]

The bill does not alledge that the mortgage in favor of the bank, and the alledged covenant from Holman to Brown, were made in Alabama, and as citizens of other States are indispensable defendants, the court has no jurisdiction of the case. The statute law prohibits such proceedings against non-resident defendants unless the cause of action arose within this State. [Aik. Dig. 290, § 27; 5 Ala. Rep. 165; 2 Story's Eq. 48, § 744.]

The answer of a non-resident defendant will not give jurisdiction, as it cannot be conferred by the consent of a party. But the ground of proceeding in this case is joint, upon the alledged covenant from Holman to Brown, against the non-resident defendants, Holman and Agnes Howard. The latter is an infant, and her answer has been made by a guardian

*ad litem* appointed by the court. His answer does not make her appearance voluntary. [5 Ala. Rep. 167.]

There is therefore no jurisdiction against her, and none against Holman, the other heir, as a separate proceeding against him, upon the covenant, could not be maintained, she is an indispensable party. [1 Story's Eq. § 82, 83.] The question as to the validity of the act of the legislature, is a legal question. [Colburn and others v. Broughton and others, in this court at January term, 1846.]

There are demurrers in some of the answers to the bill. Upon the argument of a demurrer, any cause of demurrer not shown in the demurrer filed, may be alledged *ore tenus* at the bar, and under the general demurrer, the want of proper parties may be alledged *ore tenus* as a cause of demurrer. [1 Story's Eq. Pl. § 464; 6 Johns. Ch. Rep. 143; 1 Hoffman's Ch. Prac. 218; 3 Paige, 321, 452.]

A bill must be dismissed upon the hearing for want of equity, though there be no demurrer, and the answer do not insist upon the want of equity by way of demurrer. [3 Stew. Rep. 9; 1 Johns. Cases, 492, 496; Story's Eq. Pl. § 447; 2 Porter, 177; 2 Dallas, 368; Cox's Dig. 413, § 24.]

The statute of limitations is pleaded, but the bill shows relief is barred by the lapse of time, and the statute of limitations. Upon this ground a demurrer lies to the bill. [Lewin on Trusts, 24 Law Library, 313, top page.]

The bill is multifarious and therefore bad. A majority of the defendants do not claim under Holman. The defendants who claim under Copeland have no interest in the success of the complainant against Holman's heirs, and subjecting for the benefit of the bank another and a better title than Brown's or Copeland's. [Colburn and others v. Broughton, adm'r, and others, in this court, decided at January term, 1846; Gaines and wife v. Chew and Relf, 2 Howard's Rep. 619.]

The bill does not alledge that Brown was ever in the actual possession of the premises. It does not show that Holman's heirs are trespassers, but brings them before the court as the owners of a good legal title, to an undivided moiety of the estate to which the complainant alledges he is equitably entitled. The bill does not alledge that Denton holds under

Copeland. In effect, the bill shows he does not hold under the title of Copeland, as it alledges that other persons named in the bill, of whom Denton is not one, hold all the real estate conveyed by Brown to Copeland, and by him to others, except the lot released by the bank to Sheffield & Barney. As the bill does not alledge that Denton holds under the title of Brown and Copeland, *there could be no relief against him*, if it were proved he held under their title. As the bill alledges Denton is in possession of a part of the premises, and does not state that he holds under Brown or Copeland, and the better and paramount title is shown to be in the heirs of Holman, he may, and the inference is that he does, hold under these heirs, and there can be no decree against him.

CAMPBELL and PHILLIPS, contra.

The circumstances in which it is allowable for one defendant in a court of chancery to examine his co-defendant, are stated in the elementary books. The defendant must have no interest in the result to be accomplished by the use of his testimony. If interested in the event of the cause, or in the costs of the suit, the party is not a competent witness. [Markham v. Smith, 11 Price, 126 ; Walley v. Brownhill, 13 Ib. 500 ; Eckford v. Dekey, 6 Paige, 565 ; Dixon v. Parker, 2 Vesey, sr. 219 ; Ib. 627 ; Whipple v. Lansing, 3 J. C. R. 612 ; 3 Atk. 402.]

The objection to Roper is, that he is directly interested to defeat the mortgage. His estate in the premises is subject to that mortgage, if it is an operative conveyance ; and he was interested to show that it had been discharged. He had suffered a decree *pro confesso*, it is true, but the establishment of the conclusion that the mortgage had been paid, would have required a dismissal of the bill against all the defendants, and would have concluded the plaintiff on the subject. [Clason v. Morris, 10 Johns. 547.]

The objection to Morrell is, that he is a defendant to the cause, and interested to the same extent as Roper. He has answered as well as demurred to the bill, and put in issue every allegation. He has, it is true, declared that his interests have been parted with, but the fact has been put in issue, and no proof has been made that such is his relation to

the property. He is liable for the costs of the suit, and charged as a *particips funndis*, with those who introduce him as a witness. [Hutchinson v. Reed, 1 Hoff. Ch. Rep. 315; Williams v. Longfellow, 3 Atk. 582; Deacon v. Deacon, 7 Simon, 378; 4 Eq. Dig. 521, and cases above cited.]

The objection to Mrs. Holman appears from the answer of the defendant, Oliver Holman. He states that the conveyances by Mrs. Holman to Brown were for a temporary purpose, and not designed to impair her interests in the State. That the mortgage to the Bank of Norfolk was a violation of this agreement, and that the rights of the heirs of Holman ought not to be concluded by the act of Brown. Under this state of facts, it will be seen that the relief of the estate from this mortgage, was a matter in which Mrs. Holman is directly interested. [Cases above cited.]

The defendants had no right to employ the papers entitled depositions taken in the case of Davenport v. Bank of Norfolk.

No evidence of any kind was given to identify them. No bill or other record was shown to satisfy the chancellor that a cause was pending in court.

No evidence is produced to show the genuineness of the depositions, or the identity of the witnesses. The mode in which they were produced to the court is fatal to the effort to make them evidence. The counsel for the defendants *offer papers* which they state to be depositions of the same witnesses in another cause. No proof is shown of the cause —of the genuiness of the papers—of the identity of the witnesses. [3 Hill & Cowen's Notes, 1099; Gr. Ev. 110.]

The evidence of Ames, Sheffield, Morrell, and Roper, seeking to charge the Bank of Norfolk, by conversations to which it was not a party, is inadmissible. [Branch Bank. at Mobile v. Hunt, 8 Ala. Rep. 876; Bank of U. S. v. Dunn, 51.]

The act of the general assembly of Alabama is constitutional. The whole subject of remedial process, and of remedial laws is entirely within the competency of the legislature. Powers of sale to enforce vested rights are created and modified in every session of the general assembly. When the power does not exist in courts, the legislature creates courts,

and confides its execution to them. It may delegate the execution of the same powers to another authority. The choice of means to enforce existing rights in the absence of an express restriction, belongs to the general assembly. [Watkins v. Holman, 16 Peters, 27 ; Livingston v. Moore, 7 Peters, 469 ; Davison v. Johonnut, 7 Metcalf, 388 ; Rice v. Parkman, 16 Mass. 326 ; 15 Wend. 436 ; 14 Serg. & R. 435 ; 4 Mon. 91 ; 6 Ib. 594 ; 6 Conn. 54 ; Ib. 190.]

The bond of Holman, although it expresses no consideration, is evidence of a consideration. It is evidence by virtue of the statute of this State. [Young v. Foster, 7 Porter, 420 ; Click v. McAfee, Ib. 62 ; Chamberlaine v. Darrington, 4 Ib. 415.]

It is evidence under well known common law principles. [21 Wend. 166 ; 8 Mass. 162 ; 3 Bur. 1639 ; 1 Kean, 551 ; note.]

The court of chancery has jurisdiction to do full and complete justice, and to avoid a multiplicity of suits ; to disincumber property from embarrassment, and in exposing it for sale, to expose it in such a manner as will secure to the parties the best price. The bond of Holman is a burden on the conscience of his heirs, and they are bound to convey the property to the assignees of Brown. They are bound to hold the *legal* title subject to the assignments of Brown of the equitable title. The assertion of title by Holman's heirs is a fraud.

A statement of the case will show the propriety of equitable jurisdiction.

Holman's heirs have suits for a portion of the property— they have possession of a part—the Bank of Norfolk, as mortgagee of Brown, and the purchasers of the title of Copeland, each have suits. A sale of the property under these conflicting titles would be to sacrifice the interests of all parties. The equities of the different parties in regard to the order of sale could not be consulted.

Is there any reason for sending the question of the validity of the act of the legislature to a court of law ? Is there any peculiar necessity for a trial by jury ?

Is there any disputed, or disputable fact, which renders

51

this so important as to counterbalance the material and equitable circumstances that have been suggested ?

The court is compelled to take jurisdiction over the heirs of Holman to the extent of one half the claim. The bond of Holman conveys a mere equity to Brown, and the purchasers from Brown are compelled to come into this court to perfect the title to this extent. Having jurisdiction of the cause to foreclose the mortgage, and to perfect the title as to one half, why should not the whole case be decided ? The court will take jurisdiction to avoid circuity of action.

This view is fortified by the circumstance, that the heirs of Holman have set up their claims *pendente lite*. The claimants under Brown have suffered themselves to be ousted by these parties, after the suit was commenced by the bank.

This court was in possession of the subject matter of the suit. Is it consistent with the dignity of the court to say, that you must go off and settle a dispute which has arisen since your bill was filed, and then you can proceed. Or does not this fall within the principle that a court of chancery having jurisdiction *as to one purpose, will exert it as to all.*

1. The court will then take jurisdiction to avoid a multiplicity of suits. [Baird v. Blond, 3 Mun. 570 ; 2 Johns. Ch. R. 525.]

2. To avoid circuity of action. [Hinson v. Myers, 1 Hill's Ch. R. 41.]

3. To enforce the equitable claims of the mortgagee upon the conscience of the heirs of Holman, that they fraudulently deny. [2 Mun. 196.]

4. To disincumber a title, which the court is required to sell, from entanglement, and to sell it favorably. [Blight's heirs v. Banks, 6 Mon. 194 ; 6 Leigh, 587.]

5. Having possession of the subject, on the principle of doing complete justice, by deciding all questions that may arise. [5 Peters, 264 ; 10 Johns. 587.]

6. Having jurisdiction of the cause, the subject matter and parties, and proceeding to determine it, it will decide the whole cause, and bring all the parties before it. [Harris v. Smith, 2 Dana, 11.] It will not permit itself to be ousted. [Wadleigh v. Veazie, 3 Sumner, 164.]

Upon all these questions, we cite, 11 Ohio, 488 ; Alexan-

der v. Pendleton, 8 Cranch, 462; 12 Gill & John. 306; 1 Johns. Ch. Rep. 160; 3 Howard's (S. C.) Rep. 441; 5 Leigh, 466.

The questions of multifariousness is answered by the cases cited in 2 Howard, 619; Kennedy v. Kennedy, 2 Ala. Rep. 571.

The case of the Attorney General v. Cradock, 3 Mylne & Craig, 85, is quite in point on this subject.

ORMOND, J.—Perhaps the best mode of considering this complicated case, is, by first disposing of those questions, which are preliminary to the main question, before proceeding to the discussion of the merits of the case. We will, therefore, first dispose of the questions arising upon the rejection of the testimony of the defendants, and the refusal to reject that of the complainant.

The bill is filed by the Bank of Norfolk, to foreclose a mortgage on certain lands in the city of Mobile, executed by one Charles Brown; the title to one half of which, it is alledged in the bill, was obtained by Brown in the following manner: "That after the death of the said Oliver Holman, his widow took out letters of administration upon his estate, and by authority of an act of the legislature of the State of Alabama, the said administratrix conveyed by deed, to said Charles Brown, all the interest of said Oliver, remaining in the said estate, for and in consideration of the sum of $———, a copy of which deed is filed, marked exhibit B."

Oliver Holman, by his answer, admits that Brown purchased under color of the act mentioned, but denies knowing whether the bond which the act required to be given, preparatory to a sale, was ever executed by Littlefield & Davenport.

The act of the Legislature referred to, was passed on the 31st December, 1823, and is as follows:

*Be it enacted, &c.* That the administratrix of the late Oliver Holman, resident in the city of Boston, in the State of Massachusetts, be and she is hereby authorized, to sell by Nathaniel Littlefield, and Gorham Davenport, her attorneys in fact, the real estate of which the said Oliver Holman died seized in the city of Mobile, on such terms, and in such man-

ner, as may be deemed most advantageous to the estate of the said deceased.

2. That the said administratrix be, and she is hereby authorized, by her attorneys aforesaid, on the sale of said estate, to make the purchaser, or purchasers, as the case may be, a legal conveyance of the same, which shall be as binding as if the same had been made by the said Oliver Holman in his lifetime.

3. That Nathaniel Littlefield and Gorham Davenport, before the sale of the estate aforesaid, shall enter into bond, with sufficient security, payable to the judge of the county court of Mobile county, for the true and faithful payment of the money arising from the sale of said estate, into the hands of the administratrix thereof, to be appropriated to the payment of the debts due by the decedent.

At the hearing, the complainants produced a bond, in the penal sum of $30,000, purporting to be the bond of Littlefield, Davenport, and others, and to have been executed in compliance with the preceding act, previous to the sale of the land of Holman's estate, which the defendant objected to, because there was no allegation in the bill that such a bond was made.

It is certainly a cardinal rule in equity pleading, that the complainant should alledge such facts, as show a title in himself; if he does not, the bill is demurrable. The facts must be so stated, in the language of Judge Story, that the court may infer a title in the party. [Eq. Pl. 556, § 730.] It is not however necessary that any thing more than a *prima facie* title be averred. Thus, it is sufficient to rely on a feoffment, without alledging livery of seizin; or a bargain and sale, without averring an enrolment. [Coop. P. 5; Harrison v. Hogg, 2 Vesey, jr. 327.]

The bill alledges the execution of the mortgage by Brown, who, it is alledged, was seized, or pretended to be seized, in fee, of the mortgaged estate. This was doubtless a sufficient allegation of title in Brown, if the entire purpose of the bill had been to foreclose the mortgage. It had another object. Brown, though in possession of the entire estate, had a legal title to but an undivided moiety, and for the residue, claimed title under a covenant from O. Holman, deceased, to

make title, and for this portion of the land, the bill seeks a specific performance from the heirs of Holman. In relation to the other half, it is alledged, that Brown held the deed of the administratrix, by virtue of a sale made under the authority of an act of the legislature of this State. In our opinion, this allegation was sufficient. We cannot presume that the sale was not made in conformity to the act, but until the regularity of the sale is questioned, will presume that it was conducted in the manner directed by the act. And this being put in issue by the heirs, it was clearly competent for the complainant, to prove the execution of the bond, which the act made a pre-requisite to the sale. The validity of the law, will be hereafter considered.

The propriety of the exclusion of the defendant's testimony, will be next considered.

Most of the testimony thus excluded, was of defendants to the bill, whose testimony was directed, on motion, to be taken by the chancellor. The order to examine a co-defendant, as a witness, does not ascertain his competency to testify, and if, at the hearing, it appears that he has an interest, his testimony will be rejected. [Whipple v. Lansing, 3 Johns. C. 612; Murray v. Shadwell, 2 Ves. & B. 401.]

The deposition of Roper was properly rejected, as he had a direct interest in the event of the suit. He was a purchaser of part of the land from Copeland, under an assurance, as he states, that the mortgage of the bank was satisfied; and as a decree against the bank, either because of the invalidity of the mortgage, or discharge of the mortgage debt, would exonerate his property from this incumbrance, he was clearly an incompetent witness for the defendants.

The deposition of Morrell was also properly rejected. He was also a purchaser from Copeland, with notice of the mortgage, and in his answer denies having any interest in the controversy, because, as he states, he had sold, and conveyed the land as purchased, to several persons whom he names, by quit-claim deeds, copies of which he offers to produce. He further proceeds to answer the entire bil; insists that the mortgage debt was paid; charges the bank with collusion with Copeland; insists on proof of all the allegations of the bill, and demurs to so much of it as seeks a specific perform-

ance. A party improperly made a defendant, and who wishes to be discharged without the payment of cost, must not only disclaim all interest in the controversy, he must also abstain from engaging in the defence of the suit. By so doing, he makes himself a party to it, and although if not interested, he must be dismissed, he will not be entitled to costs. The defence made by this witness, is as active, and energetic, as that of any other defendant to the suit, and he had therefore a direct interest to cast the costs upon the plaintiff, which is such an interest as would disqualify him from testifying for his co-defendants. [Markham v. Smyth, 11 Price, 126; Wooley v. Brownhill, 13 Id. 600.]

Again, he is, as a purchaser from Copeland with notice of the mortgage, directly interested in the event of the suit. From this interest he seeks to absolve himself, by alledging a sale without warranty of title ; but being *prima facie* incompetent from this cause, his competency should have been shown at the hearing, by the production of the deeds, or other satisfactory proofs of their contents. It has been already observed, that the competency of a defendant, examined as a witness for his co-defendants, must be shown, if objected to at the hearing. This precise objection was taken, and not removed, he therefore, for this cause, as well as the preceding, appears on the record as an interested witness.

Mrs. Holman, the widow of O. Holman, deceased, was made a defendant, and answered, disclaiming all interest, and praying to be dismissed. Her testimony was also taken by her co-defendants, and in our opinion was, so far as the objection went, correctly rejected by the chancellor.

Her son O. Holman, in his answer, alledges, that the conveyance of the administratrix to Brown, was induced by the persuasions of the latter, to enable him the better, to settle up the affairs of the firm, of which her husband and Brown were the partners. That after the conveyance was thus made, Brown borrowed $20,000, to enable him to improve the property, and executed his bond with condition, when this sum was discharged by the rent, to reconvey to her and her family. Without now stopping to inquire, what effect a secret trust of this kind, could exert upon the plaintiff, lending its money to one having the legal title, upon the security

Heirs of Holman, et al. v. Bank of Norfolk.

of the property, it is perfectly apparent, the administratrix was directly interested to maintain this defence, as its success would reinvest her and her children, with the title she had parted with to Brown, and defeat the mortgage.

Certain portions of the interrogatories, and answers of Barritt Ames, were also objected to, and rejected by the chancellor. The design of the third question, is to prove the hand writing of Brown, to a letter addressed to G. Davenport, in Mobile, in relation to his property in Mobile, and stating, that he had, with the consent of the Bank of Norfolk, appointed Mr. Ames as his agent in Mobile, &c. It is very clear, that no declaration of Brown, can affect the bank ; it is as to the bank mere hearsay. The fourth, fifth, and sixth, relate to conversations between Brown and Ames, by which the latter was directed to transmit to Copeland, the rents and proceeds of the estate in Mobile, and informing him, that Copeland was the *agent of the bank*, to which Copeland assented, and that he remitted to Copeland at different times, upwards of $28,000, as the agent of the Bank of Norfolk. That he considered Copeland as the agent of the bank, and made the remittances to him on the part of Brown, in that character.

The evident design of this testimony, is, to establish the fact that this sum of money was paid to Copeland as the agent of the bank, in extinguishment of the mortgage. But to make Copeland the agent of the bank, its assent was necessary. Neither the declaration of Brown, or the assent of Copeland to receive the money as the agent of the bank, has any tendency to prove, that the bank knew, or assented to the arrangement, between Brown and Copeland. Nor is there any thing in the fact, that Copeland was a director of the bank, from which such assent can be inferred. These answers were therefore properly excluded, as it is not shown that the bank was privy to any of these conversations, or arrangements, or in any manner gave its consent to the appointment of Copeland as its agent.

The agreement entered into by counsel, in another suit, upon the answer of the Bank of Norfolk, to a bill filed by G. Davenport, against Brown and others, appears to us to be wholly irrelevant, and was properly excluded. That portion

of the agreement relied on, reads thus : " And it is agreed between the attorneys to this suit, that no objection shall be made, that Copeland has hitherto been permitted to represent our claim ;" which is signed by the counsel for the complainants, and the bank. The purpose of offering this, seems to be, to establish the fact, that Copeland had represented the bank in the management of that suit, from that to infer the fact, of Copeland's agency, or interest in the claim. Assuming the claim spoken of, to be the mortgage now under consideration, and that in the suit, Copeland was permitted to represent the bank, and control the management of the suit, this fact, if important to be proved in this cause, could not be established by the admission of the counsel of the bank, in a previous cause, with which this has no connection. As the representatives of their clients, counsel have doubtless power to admit the existence of the facts ; but such admission, as proof of the existence of the fact, is available only in that particular case. It would be a most alarming doctrine, that an admission made by counsel, in the progress of a cause, was proof of the fact so admitted, through all future time. The authority of counsel is confined to the case in which he is employed ; he has no power to bind his client, beyond the effect of the admission, in the particular case in which it was made.

The complainant also objected to the reading by the defendant of the depositions, of Simmons, Hickling, and Whiting, taken from the files of another cause, and they were rejected by the court. Depositions taken between the same parties in another suit, where the same point is in issue, may be given in evidence. [Ritchie & Co. v. Lyne, 1 Call, 489 ; Rowe v. Smith, Id. 487; Arderry v. Commonwealth, 3 J. J. M. 183 ; Lawrence v. Hunt, 10 Wend. 80 ; Boardman v. Reed, 6 Peters, 328.] The precise objection was taken to the reading of these depositions, that they were not taken in a case between the same parties, and it does not appear from the record that the difficulty was removed. There is, therefore, nothing shown upon the record making these depositions evidence of the facts there stated ; and if offered for that purpose, they were properly rejected. There is one purpose, however, for which they were competent, to impeach the

credibility of these witnesses, by showing, that they deposed differently at another time. And as these witnesses had been examined by the complainant in this cause, and cross examined by the defendants, that was doubtless the purpose for which they were introduced: such also appears to have been the understanding of the complainants, from the exception taken. When the object is not to establish the facts stated by a witness, but to impeach his credit, a deposition made by him, between any parties, is evidence to contradict him, but not to support his testimony. [1 Stark. Ev. 276; Holdroyd's case, 2 Russ. & R. C. C. 89.] And in such a case, where part only has been read, the opposite party may read the entire deposition, for the purpose of showing his consistency. [Temperly v. Scott, 3 C. & P. 341.]

It is objected, that the attention of the witnesses should have been called to these statements previously made, that they might have an opportunity to explain them, but we can find no such qualification annexed to the right of introducing a previous deposition, for the purpose of discrediting a witness. The rule here adverted to, is the one settled in the Queen's case, 2 B. & B. 313, and which has been frequently acted on, and affirmed in this court. The rule, by the very terms in which it is proposed, applies to the oral examination of witnesses, proposed to be impeached, by acts done, or declarations made, relating to the cause. It cannot, in the nature of things, apply to such a case as this, because, until the last deposition is taken, it cannot be known that there will be any discrepancy between them. These depositions must, therefore, be looked to, so far as they contradict the statements last made; and this closes our examination of this part of the case, in which we have endeavored to be brief, even at the expense of perspicuity.

It is further urged, that the bill is multifarious, because it seeks a specific performance against the heirs of Holman for a moiety of the land, and a foreclosure of the mortgage upon the entire tract against all the defendants. This is a common objection, and has been frequently passed on by this court.

It is perfectly obvious that all these defendants have a common interest in the subject in litigation, though they claim

under distinct titles—the purchasers from Brown, and Copeland, and the heirs of Holman, being alike interested in opposing a foreclosure of the mortgage, and this, it is said, is sufficient to justify their being united in the same suit. [Story's Eq. Pl. § 285, and cases cited; see also the At. Gen. v. Craddock, 3 Mylne & Craig, 85; and the Atto. Gen. v. Mayor of Poole, 4 Id. 17, as strongly in point.]

But this case is peculiar, and although it may be brought within the influence of the cases cited, and others determined by this court, to be found on the brief of counsel, yet it appears more distinctly to belong to other acknowledged heads of chancery jurisdiction. If a suit were prosecuted against the heirs of Holman alone, for a specific performance of the covenant of their ancestor, and a decree obtained against them, another suit would still be necessary for the foreclosure of the mortgage. Therefore, to prevent a multiplicity of suits, and the delay and expense consequent thereon, there being no incompatibility in the defence of the defendants, but all having a common interest, in resisting the decree sought to be maintained, they may be united in one suit. If the bill was for a foreclosure of the mortgage merely, omitting the heirs of Holman, and consequently without ascertaining their liability to perform the contract of their ancestor, the complainant might be prejudiced by the sale of the property under such circumstances; but the defendants would certainly be injured by the sale, with such a cloud impending over the title. It is not the habit of courts of equity, to sell a doubtful title, where it has the power to clear it up, and ascertain its true character; and hence the rule, that all parties claiming an interest, and within the jurisdiction of the court, must be made parties, that there may be an end of the litigation. This case falls fully within this principle.

Again, the heirs of Holman assert the invalidity of the act of the legislature, under which Brown the mortgagor, acquired title to one half the property, and have in fact as such heirs, acquired possession of part of the mortgaged estate. They were, therefore, if not necessary, at least proper parties, as they asserted a title hostile to the mortgagee, in common with the other defendants. Upon all these grounds, then,

we are clear in the opinion, that they were properly joined with the other defendants in the bill.

It is also contended, that the covenant entered into by O. Holman, deceased, with Brown, in 1821, for the conveyance of one half the estate, ought not to be enforced against his heirs, because the price to be paid for the land not appearing in the contract, it is void under the statute of frauds; and if this objection is not tenable, then a court of equity will not compel the heirs specially to perform the contract, as it is not shown to be founded upon adequate consideration.

The statute of frauds requires all agreements for the sale of land to be in writing, and signed by the party sought to be charged, and certainly, as contended, the price to be paid, is quite as important as any other term of the contract; and if it is not shown by the contract, it cannot be supplied by parol testimony. But it is a mistake to consider this covenant a contract for the sale of land. It is an unconditional promise to convey the land to Brown, at a time stipulated; and as it does not require any act to be done by Brown, as a condition upon which the conveyance is to be made, it includes, by necessary implication, at least *prima facie*, an admission that the consideration, whatever it was, which was the inducement to the promise, had been paid or performed by Brown. It is an admission that a sale has been made, and not a contract, professing to recite the terms of a sale, and is not therefore within either the letter, or spirit and design of the statute of frauds; the design of which being to prevent parol proof of the sale of land, requires all the constituents of the contract to be in writing, and signed by the party against whom it is attempted to be enforced. But why require the terms of a contract to be stated, which the party admits in writing, under his seal, he is bound to consummate by the execution of a deed? The object of the statute is to prevent fraud and perjury, but here there is no danger of either, as the party to be charged has, by his obligation, defined the precise extent of his liability, and has not made it dependent on any act to be performed by the other party. That this conclusion is correct, will be obvious, if we consider what would have been the effect of this bond, if it had contained a penalty. In that event it is clear, that

the obligee could have maintained an action at law, and have recovered the penalty, upon the refusal of the obligor to convey the land; and that the only breach necessary to be assigned, would be the refusal to convey. The legal effect of the bond is not changed by the omission to insert a penalty; that only affects the damages, and does not touch the construction of the instrument, which must be the same in equity as at law.

This conclusion does not however determine the question, as it still remains to be considered, whether it is such a contract as a court of equity will enforce the performance of. In Gould v. Womack and wife, 2 Ala. R. 83, we considered very fully the power of chancery to decree a specific performance, and we there held, that the jurisdiction was not compulsory—that it was an appeal to the extraordinary power of the court, and that it would not compel the performance of a contract, unless just and reasonable in all its parts, and founded on adequate consideration. The record, though exceedingly voluminous, affords no aid in determining the circumstances under which this agreement was made, or what was the consideration, if any, which was the inducement to the promise—whether it was a sum of money agreed to be paid, actually paid, or merely voluntary. All that we know of it is, that the covenant was made by Holman; that Brown went into possession of the property, claiming it as his own, borrowing money upon, and finally selling and transferring it by a deed in fee.

As this court cannot determine this question, without a knowledge of the facts, it becomes necessary to inquire upon whom does the burthen of proof lie to establish them, and what in the present condition of the cause, are the legal inferences from the record.

This is properly a question of pleading, for if it is necessary that the complainant, to entitle himself to a specific performance, should show that the consideration was paid, and that it was such as to call into exercise the extraordinary power of the court, it was certainly necessary that he should have made these allegations in his bill, and such is the argument in this court. Upon the other side, it is contended, that although the bond does not state a consideration, it im-

ports one at common law, and that independent of this, the *onus* of proving a want, or inadequacy of consideration, is cast upon the defendant by the act of 1811. [Clay's Dig. 340, § 152-3.] "Whenever suit shall be commenced in any of the courts, founded on any writing, whether the same be under seal, or not, the court before whom the same is depending, shall receive such writing as evidence of the debt, or duty, for which it was given; and it shall not be lawful for the defendant to deny the execution of such writing, unless it be by plea supported by affidavit. Whensoever any suit is depending in any of the courts, founded on any writing under the seal of the person to be charged, then it shall be lawful for the defendant, by a special plea, to impeach, or go into the consideration of such bond, in the same manner as if it had not been sealed." In the construction of the first branch of this statute, it has been held, that every written promise, whether under seal or not, for the payment of money, or the performance of a duty, is *prima facie* evidence of a consideration, and that it devolved on the defendant to show there was none. [Phillips v. Scoggins, 1 S. & P. 28; Chamberlaine v. Darrington, 4 Porter, 515; Click v. McAfee, 7 Id. 62; Young v. Foster, Id. 420.]

At common law, a writing obligatory, imported in itself, that it was founded upon a consideration; and as any consideration was sufficient to sustain the promise, the common law presumption went no further, than the exigency demanded—that there was a consideration, not that it was full, or adequate. Courts of equity have, however, always exercised the right of inquiring into the consideration of sealed instruments, and it might perhaps be well doubted, whether it would decree a specific performance upon the common law presumption, as the consideration might be grossly inadequate, or in fact be entirely voluntary. But we are relieved from the consideration of this aspect of the case, because, in our judgment, this question is decisively settled by the statute previously cited, and the adjudications upon it. The statute did not merely place bonds and unsealed instruments upon the same footing, in regard to pleading, it also promulgated a rule of evidence, applicable alike to sealed and unsealed instruments, by which the instrument, after its considera-

tion was put in issue by a plea, was made *prima facie* evidence of the "debt, or duty," and the burthen of proving the contrary, cast upon the defendant. In the case last cited, Young v. Foster, *supra*, it is said, the statute "has the effect of making the instrument sued on *prima facie* evidence of the debt, or duty, it imports to be given for—that the consideration of such writing can only be put in issue by a special plea, and that the burthen of proof will then be on the pleader." This is conclusive. The instrument is presumptive evidence that the obligor was bound to make a title to the land, and until this presumption is repelled by proof, effect must be given to it, or the statute becomes a dead letter, as its whole purpose was to change the common law rule, which requires the plaintiff to support his case by proof of a consideration.

The cases we have cited, were it is true suits at law, but the rules of evidence are the same at law and in equity. It would be most unreasonable to suppose, that the statute was not intended to apply to suits in equity, if there was nothing in the statute expressly including such suits. But its language is, that such shall be the effect of written instruments when a suit is depending "in any of the courts," of the State; courts of equity, are therefore within the letter of the statute.

From these considerations, it follows, that until the covenant is impeached by proof, that it was a voluntary act without consideration, or that the consideration was grossly inadequate, or some fact, or circumstance shown, which would prevent this court from interfering between the parties, and leave them to their legal remedy, the complainant has the right to call on the heirs of O. Holman to make the conveyance, which it would be the duty of their ancestor to make, were he now alive. The heirs, as such, are in truth mere volunteers, and invested with no right, which their ancestor did not possess, and can therefore urge no objection which he could not make.

We come now to the consideration of that, which was probably considered the principal question in the cause—the validity of the sale made under the act of the legislature. This act it is strenuously urged, is unconstitutional, because,

as is alledged, it was an unlawful interference with the vested rights of the heirs of O. Holman.   The act has been already cited at length.   It authorizes the administratrix, resident in Massachusetts, by certain persons, her attorneys in this State, to sell the real estate of her intestate in Mobile, for the purpose of paying the debts of the deceased.   This is a question of great delicacy, and magnitude, involving as it does, an inquiry into the legality of an act of a co-ordinate branch of the government—the importance of this particular case, and the number of titles depending upon the legality of similar legislation, demanded, and we have given to it, all the reflection, and examination, the recess of the court has enabled us to bestow upon it.

To a correct understanding of the question, it becomes necessary to define the terms, "vested rights," and thus to ascertain what *rights* are *vested*, in such a manner that they are placed beyond the pale of legislative control.   In the United States, certain political rights are conceded to be retained by the people, and the power to interfere with, or in any manner to impair them, not delegated to any department of the government.   Some of the most obvious of these, are enumerated in the bill of rights of this State.   These are *vested rights*, the inheritance of every American citizen.   We have mentioned this class of rights, to prevent confusion, and to distinguish them from those rights, which belong to all the people of the States, as members of the body politic. These, are not like those just mentioned, inherent in man, as a member of the social compact, but are those rights which are alike secured to all the people, by the existing law of the State ; which being derived from the authority of the people, and expressed by the legislative will, may be changed, modified, or altogether abrogated, by the same power which gave them existence.   The only limitation upon the exercise of this power by the legislature, over the appropriate subjects, and within the proper sphere of legislation, being, that it shall operate on all—that what is law for one man, shall be the rule of conduct for all.

The right of succession to property, by the heirs at law of a deceased person, or to take by bequest, is not a natural right inherent in man, but is purely a civil right, which is a

vested right, because secured by the law of the State. It was the established law of the State long anterior to the passage of this private act, that all the property, both real and personal of a decedent, should be subject to the payment of his debts, and it follows, that where real property descends to the heir, or devisee, it does not vest in him absolutely, but subject to the payment of the debts of the former proprietor; and for this purpose it may be sold on petition of the administrator, by order of the orphans' court, and the title of the heir, or devisee divested. Such being the law applicable to all persons, the only question is, whether the legislature had power to do by a particular law, applicable to a particular case, that which it had previously provided might be done under the general law, in all similar cases.

There are certainly objections to such partial legislation, but it appears to us impossible to maintain that the legislature cannot accomplish by a particular law, the same object, which might be effected by the general law then in existence, although there is a different mode provided to effect it. It cannot, it is true, pass a particular law, which deprives those on whom it is to operate, of rights which under the same circumstances, are secured to all other citizens; and it is supposed such is the case here, because the heirs were not required to be cited, to contest the fact of the indebtedness of their ancestor, previous to the sale. It was competent for the legislature, to have authorized a sale by the orphans' court, without a citation to the heir in all cases, as is done in many of the States; but as the general law of this State requires a citation to the heir, and conceding this right of the heir to contest the fact of the necessity for a sale, to be a vested civil right, he is not deprived of it in this case. It can make no essential difference, whether the heir is cited before a sale is ordered to be made, or whether the purchaser takes the property subject to the action of the heir, if the ancestor was not indebted so as to make the sale necessary. The essence of the right consists in the ability to institute an inquiry into the propriety of the sale, and whether this right is to be exerted before the sale is made, or is left to the discretion of the heir, at his pleasure to institute it afterwards, relates to the remedy, which the legislature may alter, or change at their pleasure,

so that the right is not impaired. This right is not in terms reserved to the heir by this private act, but it is necessarily implied, and upon the concession upon which this argument is based, could not have been prohibited.

It is a necessary corollary from this argument, that there was no exercise of judicial power in the passage of this act. The law, it is true, is founded upon the assumption, that the estate was indebted, and required the sale of this land, but there was no adjudication of these facts, otherwise the heir would be precluded from an investigation of them. It is assumed that the facts are so, upon the representation of those applying for the law, but as there is no judgment, the legislature being incompetent under our constitution to render one, the truth of the facts so assumed, is open to contestation.

Nor is it any valid objection to the law, that the title had descended to the heir before the passage of the act, as the legislature has the power, if it chooses to exercise it, of passing laws having a retrospective effect, although they operate on vested civil rights; provided they do not impair the obligation of contracts. The prohibition in the constitution of the United States, and of this State, against the passage of *ex post facto* laws, applies only to laws passed for the punishment of crimes, and the infliction of penalties. [Calder v. Bull, 3 Dall. 386; Fletcher v. Peck, 5 Cranch, 138; Satterlee v. Matthewson, 2 Peters, 380; Watson v. Mercer, 8 Id. 110.]

Questions precisely similar to this have arisen elsewhere, and such laws sustained as constitutional, by the most respectable courts of the Union. Leland v. Wilkinson, 2 Peters, 427, is very analogous to this, in all its essential features. There, an executrix residing, and having qualified in New Hampshire, made a private sale of land of her testator, situate in Rhode Island, for the payment of the debts of the deceased, and afterwards procured an act of the legislature of that State confirming the sale. An action being brought by a devisee of the land, against the purchaser, the act of the legislature was held to be valid.

In Rice v. Parkman, 16 Mass. 326, an act of the legislature, authorizing the real estate of a minor to be sold, notwithstanding there was a general law delegating the same

53

power to the courts, was sustained.  And in Davidson v. Johnson, 7 Metcalfe, 388, it was held, that the legislature had power to authorize the guardian of a lunatic to sell a part of his ward's estate.  So, the supreme court of New York has held, that where the rents and profits of land, were given to a father during his life, with remainder in fee to his children, an act of the legislature authorizing a sale of the property for the maintenance of the father, and for the support and education of the children, was valid and binding on the children.  [Clarke v. Van Surlay, 15 Wend. 436 ; see also Estep v. Hutchinson, 14 S. & R.; Livingston v. Moore, 7 Peters, 540; Shehan v. Mather, 6 Monroe, 594; Mather v. Shehan, 6 Conn. 54.]  To these, other citations might be added, but we content ourselves with referring lastly, to the case of Watkins v. Holman, 16 Peters, 25, where the supreme court of the United States held, that this act, we are now considering, was not in contravention of the constitution of this State.  There are, it is true, adjudications denying the validity of such legislation as this, but the weight of authority is decisively the other way; and although it is undoubtedly the province of the judiciary to pass upon the constitutionality of all laws, and to declare them invalid if unauthorized by the constitution, to which all the departments of the government must yield obedience, yet it is conceded by all courts, to be a power which should not be exercised in doubtful cases.  The inexpediency of such laws as this, from their tendency to promote litigation, and the dissatisfaction which even a change of the mode, or remedy, in a particular case, always produces, is admitted, but that is a question of expediency, which the legislature must determine for itself. The utmost that can be said of the legality of such acts, after the numerous decisions sustaining them, the adjudication of the highest court upon this particular law, and the numerous acts of the legislature of a similar kind, is, that their conformity to the constitution of our free government, is not so certain, and unquestionable, as is desirable in all laws.  But certainly such scruples as these, do not justify this court in the exercise of its transcendant power, to declare the act a nullity.  To justify us in so doing, the act must be a clear,

and plain violation of the paramount law : such not being the case, we are bound to enforce it.

The objection, founded on the fact, that Mrs. Holman administered on her husband's estate in Massachusetts, and not in this State, has been incidentally considered, and answered. Whether a foreign administrator shall be permitted to sue in our courts, or to sell property, appertains exclusively to the remedy; and as such power could be conferred on all foreign administrators, it may be conferred on a particular one. The case of Wilkinson v. Leland, 2 Peters, 627, already cited, is in this respect expressly in point. As to the objection that the money was not paid to the administratrix, it is sufficient to say, that no creditor is here complaining. The only question that the heirs have any interest in litigating, is the power of the legislature to pass the act, and whether in fact a sale was made under, and in conformity to it. Whether the money has ever been paid to the administratrix, or if paid, whether she has devoted it to the payment of the creditors, are questions which do not arise between the parties to this record.

It has been already stated, that the fact whether the sale of this land was necessary for the payment of the debts of the elder Holman, deceased, was open to be contested by the heirs, but no such issue is made by them. On the contrary, the only adult heir who has answered the bill, admits, that the firm of Holman & Brown owed debts to a considerable amount, some of which it is alledged are still unsettled. This is an indirect admission of the insolvency of the estate, as the personal property of the deceased, wherever situate, was liable for his debts, and if after the lapse of more than twenty years, some of his debts are still unpaid, the inference is irresistible, that a sale of the real estate was necessary. In addition, it appears from the proof, that the administratrix declared the estate insolvent, in the probate court in Massachusetts.

The arrangement entered into between Brown, and the administratrix, for a re-conveyance of the land, can have no effect on the bank, as it had no notice of this secret trust.

The defendants also insist, that the mortgage debt has been paid by Brown. The bank admits that a portion of the

debt has been paid, and credited on the notes which are exhibited. Messrs. Hickling and Whiting, cashiers of the bank during these transactions, and Mr. Simmons, the solicitor, and also a director of the bank, have been examined, and they deny any knowledge of any payment beyond the amount credited on the notes, and state that the books of the bank furnish no trace of any other payment; and it is difficult to conceive of a negative better established. The depositions of these gentlemen in a former cause, between other parties, were offered, and were proper testimony for the purpose of discrediting them, but in our opinion, there is no material difference between the two sets of depositions, when they treat of the same facts. If, however, these depositions were stricken out of existence, it would not vary the case, as the notes are *prima facie* evidence of the debt, and it devolves on the other side to prove that they are satisfied.

It is not pretended that there is any positive proof of the payment of the debt, but the whole argument, on this point, turns upon the fact, whether Copeland was the agent of the bank, as well as the agent of Brown. It is proven that Copeland received from the agent of Brown in Mobile, a large sum of money, which he did not pay over to the bank, but which, if he was its agent, was a payment to the bank. Copeland was examined as a witness for the bank, and deposes that Brown empowered him to receive the rents and proceeds of the sales of his land in Mobile, and authorized him to pay it over to the bank, and that he did so pay over, until Brown conveyed the property to him for other purposes, after which he applied the rents and proceeds of sales to those purposes; he further states, that all the money he paid the bank for Brown, he took care to see indorsed on the notes. It is clear there is nothing in this testimony, from which it can be inferred he was the agent of the bank. Why he was not examined in the cross-examination upon this point, by the defendants, can only be explained upon the supposition, that they feared he would deny it.

The agreement between Copeland and the bank, by which the latter agreed to convey to the former, all its interest in the mortgage, is also relied on as conducing to prove his agency. But in our opinion, it does not authorize such a

conclusion. Copeland, to secure a large debt which Brown owed him, had obtained from him a conveyance of the property, but this was subject to the mortgage of the bank, and the undertaking of the bank, to release to him on payment of the mortgage debt, has no connection with a recognition of him as its agent. On the contrary, it would seem, rather that the bank would look to him as the principal, and trouble itself no further with the collection of the debt. The reason assigned by Copeland, for entering into the arrangement with the bank, is, that by getting the title of the bank, he obtained the relinquishment of the dower of the wife of Brown, which he did not have to the conveyance he had from Brown. Be the motive what it might, the agreement between him and the bank had a precise and definite object in view, which if not inconsistent with his being the agent of the bank to collect a debt which he there promised to pay, by no means warrants the inference attempted to be drawn from it.

The same remarks apply to the interference of Copeland in the management of the former suit on the part of the bank, conceding such proof to have been made. Being the owner of the equity of redemption, he was directly interested in defeating the claim set up by Davenport to one half the land, whilst the mortgage of the bank was paramount to both. In attending to the suit, he had a motive personal to himself, and we cannot therefore gratuitously suppose that he was the general agent of the bank.

The transaction with Sheffield & Barney, turns upon the same fact, the agency of Copeland. The facts are, that Brown being desirous to sell a portion of the land covered by the mortgage to S. & B., procured the bank to release to him that portion of the land. The reason assigned for this, in the bill, is, that the bank condsidered the residue of the property ample for the security of the debt. Brown resided in Boston, and Ames, as his agent, in Mobile, sold the land to S. & B. for $20,000, and received in payment $8,000 in money, and two promissory notes for $6,000 each, payable in one and two years. The cash, and the notes, were transmitted by Ames to Copeland, and subsequently it appears, Brown negotiated these notes with the bank, and received the money thereon, he having indorsed the notes. There is

no testimony that the bank received any consideration for releasing the title to this property, or that it had any motive except the one assigned in the bill, which is neither unnatural or improbable. Ames, states in his deposition, that he considered himself both the agent of Brown, and the Bank, in making the sale, and so stated at the time to B. & S., and that he transmitted the money to Copeland, as agent of the bank, but he admits he had no intercourse with the bank, and derived his impressions entirely from the declarations of Brown, and the supposed assent of Copeland. It is too clear for argument, that the bank cannot be affected by this transaction. The discount of the notes by the bank, is conclusive that they were not paid to it in discharge of the debt, and it has been previously shown, that there is no proof of Copeland's agency, so as to affect the bank with the receipt of the money by him. There was doubtless some arrangement between Brown and Copeland, between whom there were large money transactions, that the latter should pay Brown's debt to the bank; but this, it is certain from his own deposition, and that of the bank officers, he did not do, but in part, and such payments as were made, he caused to be credited on the notes. We may dismiss this part of the cause, by saying, that there is no fact or circumstance, from which we are authorized to infer, that Copeland was the agent of the bank, to receive the money due upon this mortgage.

It is a general rule, that the court will decree a specific performance of a contract for the sale of lands, if it has jurisdiction of the person of the defendant, although the lands may lie in another country, as the primary decree in *personam*, and the inability of the court to enforce its decre *in rem*, will be no obstacle to its taking jurisdiction. [Penn v. Lord Baltimore, 1 Vesey, 444.] But the converse of this proposition, is not true, at all events in this State, as the statute authorizing a decree against non-resident defendants, contains a proviso, that "the act shall not be so construed, as to authorize proceedings against persons residing out of the State, unless the ground, or cause of action, or the transaction on which the bill may be brought, took place within the State." It is not alledged in the bill that such is the fact in this in-

stance, and there is internal evidence that the covenant here sought to be enforced, was made in Massachusetts.

The voluntary appearance of the adult heir, will give the court jurisdiction as to him, but the appearance of the infant, Agnes Howard, by her guardian *ad litem* appointed by the court, cannot be considered as the voluntary appearance of the infant. The design of such appointment is to protect the interests of the infant, and it would be placing infants in a worse condition than adults to give this the effect of a voluntary submission to the jurisdiction of the court. [Erwin v. Ferguson, 5 Ala. 157.]

As the court had not jurisdiction of the non-resident infant defendant, it is now contended, that the interest of both the heirs is joint; that she is therefore an indispensable party; and although the adult heir has voluntarily submitted to the jurisdiction of the court, there can be no decree against him alone.

The general rule certainly is, that all persons materially interested in the matter in controversy, either as plaintiff or defendant, must be parties, so that the rights of all may be bound by the decree, and an end put to litigation. But this is not an unbending rule; it is one adopted for the convenient administration of justice, and may be dispensed with, when extremely difficult, inconvenient, or impossible of attainment. If a decree can be made, which will bind those which are before the court, and will not affect the interest of others, who from their non-residence, or other cause, cannot be made defendants, it will form an exception to the general rule, and the court will take jurisdiction, and determine the cause as to the parties before it. [Elmendorf v. Taylor, 10 Wheat. 167; Mallon v, Hinde, 12 Id. 193; Ward v. Aredondo, 1 Hop. 213.] In the case last cited, Ward, a citizen of New York, made a contract at Havanna, with Aredondo, for the sale of land in Alabama, upon which partial payments were made. Subsequently, A. sent a deed for the land to his agent in New York, to be delivered to W. on the payment of a certain sum, which he claimed to be due on the contract. W. denied that the sum claimed was due, and filed his bill for a settlement of the account, and for an injunction against the removal of the deed. The court sustained the jurisdic-

tion, and held, that whenever the parties, or the subject, or such a portion of the subject are within the jurisdiction, that an effectual decree can be made, and enforced, so as to do justice, the jurisdiction would be upheld. [See also, West v. Randall, 2 Mason, 190.]

The principle of these cases is decisive, in favor of the jurisdiction here. The heirs are tenants in common of this land; their interests therefore are not so blended, that the title of one cannot be determined, without the presence of the other. The interest of each is distinct, and separate, though depending on the same title. Each could sell his interest, without the consent of the other, and upon the death of either, it would descend to his heir at law; it may therefore be subjected to sale, or the interest divested, by the decree of a court of chancery, without in the slightest degree affecting the right of a co-tenant. The infant defendant here, will not be prejudiced by this decree, but may, whenever she thinks proper, litigate her title to these lands. It was then the duty of the court, so far as proper parties had submitted to its jurisdiction to pass upon the title; and as to those not before the court, the sale must be made subject to their interest, or claim of title. [Hallett v. Hallett, 2 Paige, 18.]

It is supposed that the bill does not alledge that Brown was ever in the actual possession of the land. The allegation of the bill is, that he was seized, or pretended to be seized, in fee simple of the premises, when he executed the mortgage. This is the usual and customary allegation, and the answer of the heir, in terms, admits that he was in possession of the land in 1824, some years previous to the mortgage, asserting title under the covenant with O. Holman, the elder, and under the purchase made at the sale of the administratrix.

It is also argued, that no decree can be made against the defendant, Denton, because the bill does not state from whom he derived his title—whether from Brown, Copeland, or the heirs of Holman. The allegation of the bill is, that Denton with others, claims to have some interest in the mortgaged premises, and he with the rest is called on to answer the bill. It was not necessary for the complainant to state the source, or the character of the title alledged to be set up against the

mortgage, for of these facts the complainant cannot be presumed to have any knowledge. It was sufficient to alledge, that a title was asserted hostile to the mortgage, and to give the person asserting it an opportunity to produce and litigate it, and that has been done here.

The objection cannot be made for the first time in this court, that notice was not given of the application to the register, for leave to file a bill of revivor against the heirs of a deceased defendant. If the order was made without the necessary notice, a motion should have been made to the chancellor to vacate it, as contemplated by the statute giving this power to the register. [Clay's Dig. 349, § 17.]

It is objected, that the execution of the covenant, from Holman to Brown, is not sufficiently proved. The only persons interested in this inquiry are the heirs of Holman. The defendants who hold under Brown, have the same interest to sustain it as the bank. The adult heir of Holman, does not deny the execution of the bond, but professes ignorance of the fact, though he admits Brown went into possession under it. It bear sdate in 1822, and appears to have been attested by John and Abraham Holman. It is proved very satisfactorily, that the signature to the bond, is in the hand-writing of O. Holman, deceased. And it is proved by two old residents of Mobile, both of whom have resided there before and since the date of the bond, that they never knew or heard of such persons as the witnesses, in this State. This was, in our opinion, sufficient *prima facie* at least, to show, that the witnesses were not within the jurisdiction of the court, and to authorize the secondary evidence. Especially in a case, where the execution of the bond was not directly controverted, where there had been a possession of more than twenty years under it, and where the bond was more than twenty-two years old, at the time the testimony was taken. To this may be added, that Brown and Holman both resided in Massachusetts, and the whole case affords strong internal evidence that the bond was executed there.

There is no foundation whatever for the argument, that the bank has slept upon its rights. The original bill was filed in 1834, two years previous to which the litigation

54

about the property commenced, by a bill filed by Davenport, to which the bank was a party, since which time it appears to have been sedulously endeavoring to enforce this mortgage.

Lastly it is contended by the counsel for Davenport, that as he has a title to one half the property, by purchase from Brown, although his title may be inferior to that of the bank, yet as the bank released to Remsen & Jude, the title to a portion of the property covered by the mortgage, and thereby increased the burthen which must fall on the residue of the mortgaged estate, he is entitled to a *pro rata* reduction.

It appears from the record, that Remsen & Jude, who were purchasers from Copeland, sold to Bartlett & Waring, and that the latter, to quiet their title, purchased from Davenport his interest in the undivided half of the property, secured to him, by the decree made in the bill filed by him, against Brown and others. It would seem therefore, that he, at least, has no interest in this question. But let us for a moment consider the pretension here set up.

The mortgagee having lent his money, and taken a mortgage on land, may if he thinks proper, release the whole, or any portion of it, to the mortgagor, or to a purchaser from him. What right has a purchaser from the mortgagor, of a portion of the land, to interfere in this matter? Between him and the mortgagee there is no privity, either in estate or in law, and as he purchased with knowledge, that all and every part of the estate was liable to the payment of the mortgage debt, he cannot complain when it is enforced. If the mortgagee should collude with an insolvent mortgagor, to make the entire loss fall on a particular purchaser, equity might afford relief on the ground of fraud; but that is neither alledged or proved, and it is impossible, that an equity can grow up in favor of a stranger, from the exercise of an undoubted right.

There is no resemblance between such a case as this, and that of a creditor, who relinquishes a collateral security held by him for the payment of the debt, to the debtor, and then seeks to compel a payment of the debt from a surety. The surety is injured in such a case, because, upon payment of the debt, he has the right to be substituted in the place of

the creditor, and to stand in his place, as to all securities held by him for the payment of the debt. But a purchaser from the mortgagor does not stand in the attitude of a surety for him to the mortgagee, and therefore has not the right of one. The last point decided in the case of the Ohio L. I. & T. Co. v. Ledyard, 8 Ala. 875, embodies a principle analagous to the one now under consideration.

The result of this protracted examination is, that the bill must be dismissed, as it respects the infant, Agnes Howard, in all other matters, the decree of the chancellor must be affirmed.

Judge GOLDTHWAITE, not sitting.

RE-ARGUMENT ordered, on motion of defendants in error.

Hopkins and Sewall, for plaintiffs in error—

Upon the construction of the act of 1811, relied upon the decision of this court in Singleton v. Gayle, 8 Porter, 27, which they insisted was in point, and was a matter necessary to be decided, and also relied upon the arguments previously urged by them, and contended, that as a statute existed when the act of 1811 was passed, forbidding a decree to be made, notwithstanding a decree *pro confesso* had been rendered, unless the demand was proved, it was evident the legislature did not intend it should apply to suits in equity, therefore the subsequent repeal of that portion of the statute did not affect the construction of the act of 1811. But the statute in relation to decrees *pro confesso* has only been repealed where there has been a service of process, and is in full force as to absent defendants, upon whom there has been no such service.

Campbell, contra.

The opinion delivered by the court, declares that the act of 1811, in so far as it provides a mode of proof, establishes a rule of evidence. This is certainly true as regards courts of law. Is there any exception in the statute to exclude the rule from courts of equity. The rules of evidence in courts of law and equity are, or should be, the same. They should

be the best in both courts, or those courts cease to be courts of justice. [3 Black. Com. 434, 436 ; 1 Story C. on Eq.]

The court of equity will follow the rules prescribed by statute, which constitute laws of property or evidence, although the statute applies in terms only to courts of law. The statutes of limitations and of frauds, are evidences of this truth. [2 Story's Eq. 57 ; Buford v. Buford, 1 Bibb, 301, 395.]

Courts of equity will give to legal instruments the same effect in equity as at law. [2 Keen. 228 ; 4 Hon. 67.]

The statutes authorize the court to carry into effect contracts for specific performance, and gives plenary powers to the court upon that subject. [Clay's Dig. 350, § 29.]

The court, by virtue of its general jurisdiction, may appoint guardians *ad litem* for absentees, although not falling within the description of the absentees mentioned in the acts. [1 Smith's Ch. Pr. 256 ; 3 Beaven, 10 ; 7 Ib. 66 ; 1 Ala. R. 388.]

The power of the court to make rules for the government of courts of chancery, authorizes the court to make rules of process to affect absent defendants. This has been done in Great Britain, under an analagous case.

ORMOND, J.—This cause has been again argued upon two points. First, upon the proper construction of the act giving courts of chancery jurisdiction of non-resident defendants. Second, whether the act of 1811, making instruments in writing evidence of the debt, or duty, for which they were given, applies as well to suits in equity as at law.

The statute authorizing courts of chancery to take jurisdiction of non-resident defendants, upon the constructive notice afforded by publication, confines it to those cases where the "ground, or cause of action, or the transaction on which the bill may be brought, took place within this State." What is the meaning of these terms ? The two first, *ground*, or *cause of action*, were doubtless intended to convey the same idea. They are, if not synonimes, certainly used to denote the foundation of the suit. To these are added the term "transaction," which, if not of precisely equivalent import with the two others, being a word of larger and more

comprehensive meaning, was evidently designed to convey an idea which could be embraced within the same category, as the other two, as all three are controlled by the language which follows, "*took place within this State*." The ground, or cause of action, then, or the transaction which is the foundation of the suit, must have taken place within this State, to give the court jurisdiction of the non-residents, who do not voluntarily appear. The meaning of this peculiar idiomatic phrase, is, to come to pass, to happen, which can with no propriety be predicated of the subject of a contract. It would be absurd to say, a contract took place within this State, because the subject on which it operated happened to be here.

But as citizens of other countries might be concerned in acts within this State, which would require the interposition of chancery, or might assert rights to property claimed by our own citizens, between whom no contract had ever existed, the legislature appears by the term *transaction*, to have intended to embrace every case in which it would be proper to compel the non-resident to come here and litigate his claims. It never was intended, that our citizens should make contracts, or acquire rights in other countries, and then compel the non-resident to come here and litigate the matter. Still less could it be tolerated, that when two foreigners have entered into a contract, one should compel the other to come to this State, and litigate his title, merely because the subject matter of the contract was here. The case of Wyatt v. Greer, 4 S. & P. was a controversy upon a contract made within this State, and we are clear in the opinion, that this compulsory jurisdiction, can only be maintained, where the foundation of the action takes place in this State. If that arises out of a contract, the contract must have been made here. If it does not arise out of a contract between the parties litigant, there must be some act done by the non-resident within this State, justifying the interference of chancery; or he must assert title in virtue of some transaction, which took place within this State.

So far as this bill is founded on the contract of the elder Holman with Brown, the compulsory jurisdiction of the court cannot be maintained against the heirs of Holman, as the covenant was made in Massachusetts. Whether it would

have varied the case, if by the contract of the parties it was to have been performed here, we need not inquire, as it cannot be inferred that the covenantor was to come to this State to execute it.

The bill charges, that the heirs of Holman have entered on portions of the mortgaged premises, and are now in the reception of the rents. Upon the principles here laid down, this is such an interference with the property of the mortgagee, as would justify their being made defendants to a bill to foreclose the mortgage on the same property. Such acts done within the State, are a submission to the jurisdiction of the courts of the State, and preclude the actor from claiming the exemption conferred on non-residents. In such cases, the " transaction" takes place within this State, within the meaning of the statute.

So far therefore, as these non-residents have by suit, or otherwise, asserted title to, or possessed themselves of, portions of the mortgage estate, and assert a title hostile to the mortgagee, they were properly made parties, and to that extent, and no further, may a decree be rendered. The rule, that where a court of chancery takes jurisdiction for one purpose, it will retain for all purposes, does not apply to such cases as this. This is a personal privilege, which the parties have waived *quoad* the particular lots on which they have entered. This waiver cannot be extended by implication, to other separate and distinct lots, with which they have never intermeddled by suit or otherwise.

As to those non-resident defendants, whether infants or adults, who assert an interest in the mortgage estate, by conveyances made in this State, subsequent to the mortgage, they are clearly not within the proviso of the statute, and may be made defendants by publication, in the mode pointed out in the body of the act.

We come now to the consideration of the remaining question—the proper construction of the act of 1811. [Toulmin's Dig. 462, § 3, 4.] The proper construction of this act, so far as it operated on suits at law, has been settled by repeated decisions of this court, as shown in the reasons given for the judgment first pronounced. Must the same construction prevail when the question arises in equity?

The rules of evidence are the same both at law and in equity. These rules are nothing more than means devised for the ascertainment of truth, and when the legislature declared that where a suit was founded on an instrument in writing, it should be recognized as " evidence of the debt or duty for which it was given," it must be held to be a general declaration applicable to all suits, in all courts, if the act itself has not precluded all doubt on the subject, by expressly declaring that it should apply, when a suit was commenced on any writing, " in *any* of the courts of this territory."

The rule here promulgated, it is urged has been deprived, of its application to suits in equity, by the subsequent acts of the legislature, for the regulation of chancery practice.

It has already been stated as a principle universally acknowledged, that the rules of evidence are the same in equity as at law, but as the mode of proceeding in these courts is different, so also are the implied admissions, which these courts make upon the default of the defendant. At common law, the plaintiff was required to prove his case, though the defendant failed to appear, and a judgment was rendered against him for such omission ; and for that purpose a writ of inquiry was awarded. Whilst in chancery, the analagous case of a decree *pro confesso,* for failing to answer, was an admission of all the allegations of the bill. This rule of the common law was changed by the act of 1823, (Clay's Dig. 351, § 39,) which required the complainant to prove his case, notwithstanding the defendant failed to appear and answer. It may perhaps be well doubted, whether this last act had any effect upon written evidence, when that was the foundation of the bill, and to which alone the act of 1811 applied. and whether it was designed to have any other effect than to change the mode of proof in suits in chancery, as to those allegations of the bill not sustained by written evidence. Be this however as it may, the subsequent statute of 1841, (Clay's Dig. 354, § 58,) restored the English rule, as to those defendants on whom the bill was served, and none of these statutes ever had any application to non-resident defendants, who by the act of 1805, might be made parties to a bill in chancery. As to them, the English rule, that the default was an admission of the allegations of the bill, has been the

law of this State, at least since the passage of the act of 1805.
[Arnold v. Sheppard, 6 Ala. 299.]

In truth, the object of the act of 1811, and that of the various acts regulating chancery proceedings, was entirely different. The former changed the rules of pleading, and shifted the burthen of proof from the plaintiff to the defendant, when the suit was on a written instrument, and by necessary consequence, introduced a new rule of evidence. The latter, (so far as they relate to this inquiry,) were designed to regulate the implied admissions, resulting from the omission of the defendant to answer. The effect ascribed by the act of 1841 to a written instrument, is entirely distinct and separate from this, and if the execution of a written instrument, the foundation of the suit is admitted, or being denied, is proved, the law then makes it evidence of the debt or duty for which it was given, and it devolves on the defendant to repel this legal presumption, by the proof of facts inconsistent with the promise, or rendering it inequitable that the promise should be performed.

We directed a re-argument on this point, not because we felt any doubt of the correctness of the judgment previously pronounced, but because a former determination of this court, brought to our notice by the petition for a re-argument, appeared adverse to the decision as announced. The case referred to, is Singleton v. Gayle, 8 Porter, 274, where it is said that the act of 1811 does not apply to suits in chancery. The opinion there announced, was not necessary to the decision of the cause, as the court had previously decided a point, which was decisive of the entire case, and affirmed the decree of the chancellor. The judge delivering the opinion then proceeds to answer an argument of counsel upon another point—the necessity of proving the bond and mortgage. As this was wholly unnecessary, it may account for the very brief manner in which the subject is treated, and perhaps palliate an inaccuracy in the reasoning of the court.

In point of fact, the decision was in accordance with the received opinion, and practice, under the act of 1823, which required the court, before rendering a decree in favor of the

complainant, to be satisfied of the justice of the demand, by sufficient evidence, notwithstanding there was a decree *pro confesso* against the defendant. This act, which was then in force, as has been already remarked, has since been repealed.

The decree of the court of chancery is reversed, as to the infant, Agnes Howard, and the case remanded for further proceedings, both in respect to her and the other non-resident defendants, in conformity with the principles here announced. In all other particulars the decree is affirmed. The costs of Agnes Howard in this court, must be paid by the defendant in error, the remaining costs will be taxed against the plaintiffs in error.