# Wilkinson, Adm'r, *v.* Bradley, Wilson & Co. *et al.*

*Bill in Equity to enforce Vendor's Lien, and for Personal Decree for Balance Due, against Debtor and an Agent who delivered up Purchase Money Note without exacting Payment.*

1. *Multifariousness ; what bill not objectionable on ground of.*—A bill seeking the enforcement of the vendor's, lien, and a personal decree, for any balance remaining after exhausting the land, against the vendee and an agent entrusted with the collection of the purchase money note, who, in collusion with the debtor and in fraud of the vendor's rights, delivered up the note, without exacting payment,—is not multifarious.

2. *Same.*—In such a case, a good ground of equitable relief is shown against the vendee ; and if the fraud and combination with the agent, fixed a joint liability on both, enforceable in equity, joining them both as defendants, will not render the bill multifarious ; if, on the other hand, there is no joint equitable liability on the part of the agent, his liability is a purely legal demand, which cannot be enforced in equity ; and although the bill sets forth one equitable ground of relief, and seeks relief also as to other purely legal demands, disconnected with equitable demand, it cannot be held multifarious on that account.

3. *Objection ; what waived.*—Where the original bill dispenses with sworn answers in the foot note, and the amended bill contains no foot note, and does not dispense with sworn answers, and answers are put in without oath, without objection, the court will not enquire whether unsworn answers were properly put in to the amended bill, but will treat them as properly filed.

4. *Transfer of credit on books of common banker ; when operates a payment.* One brother, for a debt due the other, contracted before and maturing during the late war, drew a draft on a firm of commission merchants, who were the trusted friends of both, having transacted their business for years, and kept a running account with each, prior to the date of the draft, and continuing after its maturity. The payee left the draft with this firm (whose acceptance had been waived,) for collection, and the drawer by shipments of cotton, sold before the issue of Confederate money, had put them in possession of ample funds to pay it at maturity. When the draft matured the commission house was largely indebted to the drawer, and without any specific instructions, but according to the commercial usages of the place, credited the amount of the draft in the payee's account and charged themselves with so much collected for him, and gave themselves a corresponding credit, and made a like debit in their account with the.drawer. Accounts current were sent the brothers showing these transactions, and the payee demanded gold (which had then ceased to be a circulating medium,) of the commission merchants, though no objection was made known to the drawer, who, several years afterwards, settled his account with the commission merchants, allowing them a credit for the amount. *Held :* This was a valid payment as regards the drawer, and discharged him from all further liability.

APPEAL from the Chancery Court of Madison.

Heard before the Hon. H. C. SPEAKE.

The original and amended bills in this cause were filed by the appellant, George B. Wilkinson, as administrator of

(43)

William W. Matthews, deceased, against Luke Matthews and Bradley, Wilson & Co., the appellees, to enforce a vendor's lien on certain lands sold by appellant's intestate to said Luke, and for a personal decree against said Luke and Bradley, Wilson & Co., for any balance due, after exhausting the lands, upon said Luke's bill of exchange given for the purchase money, and left with Bradley, Wilson & Co. for collection; it being alleged that by collusion between these latter, and contrary to intestate's known instructions, the bill of exchange had been delivered up to Luke without having been paid, upon pretense that it had been discharged by certain transactions between Luke and Bradley, Wilson & Co.

The case made by the amended bill was as follows: On the 4th of February, 1860, W. Matthews, who shortly afterwards moved to Texas, sold and conveyed to his brother Luke a tract of land in Limestone county, Alabama, for which Luke paid part in cash, and for the remainder drew two bills of exchange, dated Huntsville, Alabama, January 10th, 1862, upon Bradley, Wilson & Co., in New Orleans, La., due at twelve and twenty-four months after date. The first bill was for $13,867, and the second for $14,898. Acceptance of these bills was waived, and they were deposited by W. W. Matthews with Bradley, Wilson & Co., for collection.

The first of these, the bill states, was paid at maturity, and the only controversy is as to the payment of the last bill for $14,898. Luke knew that Bradley, Wilson & Co. were the agents of William to collect said bill, and they were also agents of Luke to pay it. Bradley, Wilson & Co. were indebted to Luke for an amount in excess of said bill of exchange, and when it fell due, in pursuance of a conspiracy between them, without any money having been paid, Bradley, Wilson & Co. delivered up the bill to Luke, and he allowed them a credit therefor on his account, and they debited themselves with the amount in their account with W. W. Matthews. No money passed in the transaction, which was a scheme to defraud appellant's intestate, and both Bradley, Wilson & Co. and said Luke refused, on appellant's demand, to deliver said bill of exchange to him, on the pretence that the same had been fully paid and discharged by the transaction above set forth. It was also alleged that Luke made no provision to meet the said bill of exchange, except in Confederate money, which he and Bradley, Wilson & Co. both knew appellant's intestate would not accept in payment, and that Bradley, Wilson & Co. had no authority to accept payment in anything but gold and silver, as was well known to said Luke.

The original bill was filed on the 15th day of November, 1869, and contained a foot-note, dispensing with answers under oath. The amended bill, filed July 10th, 1871, contained no foot-note, and did not dispense with sworn answers. The defendants answered both bills, but their answers were not sworn to. Each incorporated in his answer a demurrer for misjoinder of defendants, and for multifariousness, and Luke Matthews assigned, as an additional ground of demurrer, that he had never been notified of the non-payment of the bill.

It appears from the evidence that Bradley, Wilson & Co., for many years prior to 1860, had been engaged in the business of cotton factors and commission merchants and collectors, having an office at New Orleans, La., and also at Huntsville, Ala., and were the confidential agents of both Luke and William, who had for many years kept running accounts with them. William left the bills with Bradley, Wilson & Co., with authority to collect them, without instructions as to the currency in which payment should be accepted. On the 29th day of January, 1861, Bradley, Wilson & Co. furnished William Matthews an account current, from which it appears that from the 20th day of January, 1860, up to the 13th day of January, 1861, he had drawn several thousand dollars in excess of the amount to his credit, and after crediting him with the amount of Luke's first draft, which was done on the day it matured, less than two thousand dollars remained to his credit. The books of Bradley, Wilson & Co., and also an account current furnished to Luke Matthews on the 17th day of April, 1861, show that the firm then owed him a balance of $31,825 15. The items of this account, on the credit side, commenced on the 13th day of November, 1860, and continued up to the 17th day of April, 1861. On the 13th day of January, 1861, when the first bill of exchange in favor of William fell due, the amount to Luke's credit was several thousand dollars less than the amount required to pay it, but Bradley, Wilson & Co. paid it on that day, crediting William's account, and making a corresponding charge against Luke. At various times between the 13th day of November, 1860, and the 17th day of April, 1861, Bradley, Wilson & Co. had received from Luke, and sold on his account, several hundred bales of cotton, the proceeds of which amounted to nearly seventeen thousand dollars, and this sum, added to collections made by them for Luke during the same period, swelled the credit side of his account to $46,106 48; and after deducting the amount of the first bill of exchange in favor of William, and less than $500 charged against Luke during the same period,

there remained to his credit the large balance of $31,821 15. Of this balance, there remained to the credit of Luke, on the 13th day of January, 1862, nearly twenty-two thousand dollars, and on that day, Bradley, Wilson & Co. charged Luke with the sum of $14,894 20, the amount of his second bill in favor of William, and gave the latter corresponding credit. A copy of W. W. Matthews' account, in which this credit appeared, was sent to him, and it does not appear that he objected to it on that account.

On the 24th of December, 1861, William Matthews wrote from LaGrange, Texas, to Bradley, Wilson & Co., as follows: "When my bill matures, you will please send me $2,000, and hold on to the balance for further orders. If any thing should occur so that my brother, Luke, should not meet my bill, you will please do me the kindness to advance me $1,000." In reply to this, Bradley, Wilson & Co., on the 10th January, 1862, sent him by express $2,000 in Confederate money, writing him that they did so, "although the draft had not matured, as they had no doubt it would be paid when it fell due." In this letter, they also call his attention to a letter written him on the 19th day of December, 1861. In that letter, after asking authority to endorse draft or bill when paid, (it being unendorsed and payable to William Matthews' own order,) they say: "Large as the sum is, and tight as money matters are, the amount will be placed to your credit at maturity. We deem it proper to remark, that for money left in our hands, that is, subject to be drawn for at sight, we do not allow interest; but, being much in want of money these tight times, we would be willing to retain your funds, or a part of them, for a given time. If, therefore, you do not wish to draw all your money when it is due, and will stipulate an amount you will allow us to retain for a given time, we will allow you eight per cent. interest. In your reply be good enough to say how and when you want your money."

On the 4th day of January, 1862, William Matthews writes in reply: "I received your favor a few days since, and should have replied before this, but have been waiting to hear from Mr. Green, to know what kind of money he would take. I owe Mr. O'Daniel $5,000, which he will take in New Orleans, the balance I shall want as soon as I can hear from Mr. Green." In this letter he authorized Bradley, Wilson & Co. to endorse the draft for him when it was collected. On the 11th of January, 1862, William Matthews writes them, that they can keep $4,000 at ten per cent. interest for twelve months. If they do not wish to do this, he desires $5,000 kept for O'Daniel, and the balance remitted to him in gold and silver.

On the 16th of January, 1862, he again writes Bradley, Wilson & Co., to know what are the chances to collect the Luke Matthews draft. On the 18th of January, 1862, he writes, that he has given O'Daniel a check on them for $5,000, and that he will want gold, "but possibly you might prevail on him to take Confederate bonds," and in the same letter requests them, if no money has been sent him, to send him $1,000 "in Louisiana or Confederate money, if you can't get gold." On the 25th of January, 1862, Bradley, Wilson & Co., after calling attention to former letters, and acknowledging the receipt of his, write William Matthews that they "would at once forward funds, was it not you direct us to remit in gold or silver. Our banks, for a long time before the draft we collected for you was due, had suspended specie payment. Coin can not be had, unless we pay a high price for it. Gold is worth 30 to 33, and silver 20 to 25 per cent. premium. Are you willing to pay such premiums?" On the 2d day of February, 1862, William Matthews replied, that he can never think of paying such premium for coin, and adds: "You will please hold on to the balance of my claim against brother Luke, and make him pay ten per cent. damages on all that has not been received." In this letter, he says he would willingly take Confederate money, but he can not pay debts with it, and he thinks it nothing but right that his brother should pay ten per cent. interest, as he has to pay that rate on his debts.

On the 17th day of February, 1862, Bradley, Wilson & Co. write that specie has disappeared and Confederate currency has taken its place. "In this currency the draft of Mr. Luke Matthews was provided for and paid at maturity, and the amount is at your credit and subject to your order." They add further: "Your brother Luke having paid his draft according to commercial usage of the place where it was due, we do not think it our business to write to him on the subject."

Replying to this, on the 28th day of February, 1862, William Matthews writes, he would take Confederate money if he could use it, and requests Bradley, Wilson & Co. "to hold on to brother Luke's draft until times are such that he can pay such funds as I can use." In this letter, he also requests them to pay $1,000 to a Mr. Wilkinson, and to credit the draft with that amount, and the $2,000 sent by express in January preceding. He further states, in this letter, that he had his draft made payable in New Orleans for the purpose of getting par funds, as he knew he would have to pay out such, and adds: "If you have taken from brother Luke

.[Wilkinson, Adm'r, v. Bradley, Wilson & Co. et al.]

Confederate money to pay me, you done so on your own responsibility."

On the 11th day of October, 1865, William Matthews wrote his brother Luke a long letter, partly on business matters, and makes no reference to any indebtedness of Luke. So far as the evidence shows, no complaint was ever made to Luke in the lifetime of his brother, that the payment of the draft was questioned, and in 1868 he settled his account with Bradley, Wilson & Co., allowing them a credit for paying the bill, and taking some property from them in satisfaction of the balance due.

The testimony fails to show that there was any agreement between Luke and Bradley, Wilson & Co., that the latter being so largely indebted to him, should pay the draft by a mere change of credits. There was no understanding about the matter, "other than the custom and usage of the country between factors and shippers, that on a settlement of accounts the payment of the bills should stand as a credit on the indebtedness of Bradley, Wilson & Co., to Luke Matthews." Luke Matthews placed funds in Bradley, Wilson & Co.'s hands to meet the draft, and these funds were proceeds of sales of cotton and collections which were received in lawful currency and not in Confederate money.

On the 5th of January, 1862, Luke Matthews wrote his brother in response to an inquiry of his, that he had arranged with Bradley, Wilson & Co. to pay the bill, in Confederate treasury notes or bonds. With reference to this he testified: "This was a mistake. I never made any such arrangement with Bradley, Wilson & Co., nor did I ever instruct them to pay otherwise than in sound funds. Nor did I ever give them any instructions, or make any arrangements with them, except to pay at maturity. This letter was written with a view to what was the generally recognized custom and habit of the country at that time, and in the haste of the moment I assumed to state as a fact, in the special case named, what was only an inference from what would have been considered proper and right, as conforming this particular case to what I knew to be the general custom." The date of William Matthews' death is not stated, but it appears that letters of administration were granted to appellant on the 30th day of October, 1869. Luke Matthews having died during the pendency of the suit, it was revived against his executor and heirs.

The cause was submitted for final decree on bill, answer and testimony, and the chancellor holding that the bill was multifarious, sustained the demurrers on that ground and dismissed the bill without prejudice.

[Wilkinson, Adm'r, v. Bradley, Wilson & Co. et al.]

This decree is now assigned as error.

WILLIAM COOPER and DAVID P. LEWIS, for appellants.

L. P. WALKER, contra.

STONE, J.—In determining the question of multifarious-ness, the court can look only to the bill, including the prayer for relief. It is not permissible to consider the answer or proofs.—See *Halstead v. Shepherd*, 23 Ala. 558 ; *Carpenter v. Hall*, 18 Ala. 439. Two very strong cases of unequal interest in the several defendants, and yet the bills in each case held not to be multifarious, are *Horton v. Sledge*, 29 Ala. 478 ; *Flemming v. Gilmer*, 35 Ala. 62.

Speaking of multifariousness, Chief Justice COLLIER said : "It is indeed difficult, if not impossible, to reconcile all the decisions on this subject, or to educe from them general rules by which to test the objection." And it is further said, "the court will be governed by (rules) which seem best founded in general convenience, and will best promote the due administration of justice, without multiplying unneces-sary litigation on the one hand, or drawing suitors into need-less or oppressive expenses on the other."—*Kennedy v. Ken-nedy*, 2 Ala. pp. 609 to 611.

The bill in this case as amended, charges that by collusion and fraudulent combination, Luke Matthews and Bradley, Wilson & Co., surrendered up without payment—the latter to the former—the bill of exchange which is the foundation of this suit. The effect of this surrender thus made, if true, would be to destroy, or place beyond the reach and control of complainant, the evidence of his claim against Luke Matthews. There are some circumstances, under which chancery will entertain jurisdiction to recover upon a lost bill of exchange.—See 1 Story's Eq. Jur. §§ 85, 86. Possibly the fraud and collusion charged in this case would give a joint right of recovery in chancery against Luke Matthews and Bradley, Wilson & Co.—See *May v. Nabors*, 6 Ala. 24 ; 2 Perry on Trusts, § 828. But we deem it unnecessary to decide this question.

There can be no doubt that the present bill sets forth a good ground for equitable relief against Luke Matthews. It is the plain case of a vendor, seeking to enforce his lien on the land for unpaid purchase money.—See 2 Brick. Dig. 515 ; *Bunkley v. Lynch*, 47 Ala. 210. It is equally true that by the fraudulent combination and collusion between Luke Mat-thews and Bradley, Wilson & Co., charged in the bill as amended, they either fixed on themselves a joint liability to

complainant which could be enforced in equity, or they did not. If they fixed on themselves such joint liability, then the present bill against them was well filed ; and joining them as defendants, does not render the bill multifarious. The rule against multifariousness does not require that each defendant shall have the same measure of interest. The case against one defendant may be so entire as to be incapable of prosecution in several suits ; and some other defendant may be a proper party to only a part of the case.—See *McCartney v. Calhoun*, 11 Ala. 110; *Mobile & Cedar Point R. R. v. Talman*, 15 Ala. 472; *Pl. & Mer. Bank v. Walker*, 7 Ala. 927; *Jouzan v. Toulmin*, 9 Ala. 662; *Holman v. Bank of Norfolk*, 12 Ala. 369.

If there be no joint equitable liability against Luke Matthews and Bradley, Wilson & Co., then the liability of the latter to the complainant is a pure, simple legal demand, which cannot be enforced in equity. The rule is well and sensibly settled, that if a bill sets forth one ground of equitable relief, and also contains a statement which would uphold another claim, recoverable only in a common law action, although wholly disconnected with the equitable demand, such bill is not multifarious, even though it contains a prayer for relief as to each claim.—*Carpenter v. Hall*, 18 Ala. 439 ; *Varick v. Smith*, 5 Paige 137, 160.

The demurrer for multifariousness should have been overruled ; and as no other ground of demurrer has been contended for in this court, we will consider no other.

Bradley, Wilson & Co. were the factors alike of W. W. Matthews and Luke Matthews—the last two being brothers. The proof shows they collected and disbursed for each, considerable sums of money, and that, at times, each had large deposit accounts with Bradley, Wilson & Co. The bill of exchange, which is the foundation of the present suit, was left by intestate of complainant with them for collection. Another bill, part purchase of the same land, also left with them had been collected by them, the proceeds passed to the credit of W. W. Matthews on their books, and had been paid out to him in sums and in merchandise, as the same was called for. In fact, much the larger part of this first bill was drawn out by W. W. Matthews in cash and in merchandise, before it matured. The very day on which the first bill fell due, the amount of it was placed to the credit of W. W. Matthews, on the books of Bradley, Wilson & Co., and produced a balance to his credit of only a trifle under two thousand dollars. Near twelve thousand dollars of its amount had been previously drawn out by W. W. Matthews.

Soon after the collection of this first bill, an account cur-

rent was furnished by Bradley, Wilson & Co., to W. W. Matthews, in which the transactions above sketched were set forth in an itemized account; and there is no evidence that he expressed any dissatisfaction therewith. On the contrary, the bill expressly avers that the first of said bills had been paid. The payment was made in the manner above set forth, and not otherwise.

Taking up the transaction of Bradley, Wilson & Co., with Luke Matthews, we find that he also kept a running account with Bradley, Wilson & Co. When the first draft matured, there stood to his credit, on their books, but little more than half the amount of it. Still, the amount of that draft was debited to him on their books, as so much money *paid* for him, and credited on their books to W. W. Matthews, as so much money collected for him. Within two or three months afterwards, further credits were entered on the books to Luke Matthews, which swelled his excess of credit to over thirty thousand dollars, after debiting him with the amount of the first draft of $13,867 20. All these receipts by Bradley, Wilson & Co., were older in date than any issue of Confederate currency; and, hence, must have been made in money then considered lawful.

Enough of this balance remained on the books of Bradley, Wilson & Co., in favor of Luke Matthews, to leave due him January 1st, 1862, and up to the maturity of the second draft, over twenty-one thousand dollars. When the second draft matured—January 13th, 1862—Bradley, Wilson & Co., debited Luke Matthews with the amount of that draft, $14,894 20, and credited W. W. Matthews with the same amount. They had previously remitted to him, at his request two thousand dollars, in anticipation of this collection. A copy of W. W. Matthews' account with Bradley, Wilson & Co., containing this credit of $14,894 20 was forwarded to him; and we are not informed by the evidence that he ever objected to it.

As some evidence that W. W. Matthews did not expect Bradley, Wilson & Co. to collect the second draft and remit it to him in bulk, as in case of an ordinary collection by a mere collector, we may refer to his correspondence found in the record. On December 24th, 1861, W. W. Matthews wrote Bradley, Wilson & Co., as follows: "When my bill matures, you will please send me two thousand dollars, and hold on to the balance for further orders." This money was sent before the draft matured.

Again, he wrote January 11th, 1862: "If you wish to keep a part of my debt, you can keep four thousand dollars for twelve months, with ten per cent. interest."

[Wilkinson, Adm'r, v. Bradley, Wilson & Co. et al.]

We do not learn from the record that W. W. Matthews ever afterwards made any claim on Luke Matthews on account of said draft. In October, 1865, he wrote him a long letter, partly on business matters, and made no allusion to anything due from Luke to him. On the other hand, he wrote to Bradley, Wilson & Co., of date February 28th, 1862: "If you have accepted from brother Luke Confederate money to pay me, you done so on your own responsibility."

W. W. Matthews died between October, 1865, and the inception of these proceedings, October, 1869. We are not informed by the record that Luke Matthews, during the life of his brother, was ever notified by any one that the settlement of the second draft, through Bradley, Wilson & Co., was not satisfactory to W. W. Matthews.

Much stress is laid on the fact that Bradley, Wilson & Co. wrote W. W. Matthews that they could remit only in Confederate money, unless he would consent to pay a high premium for coin, and that he refused each proposition. Also, that Luke Matthews wrote him that arrangements had been made for payment of the draft in Confederate money. It is not true that Bradley, Wilson & Co. collected in Confederate money. The receipt by them was long anterior to the first issue of that circulating medium, and hence must have been in some other currency. That the currency of the country had so entirely changed, in that Confederate currency had become the only circulating medium in which payment could then be made without a great sacrifice, was, perhaps, unquestioned. We suppose this entire change in currency caused each of these parties to propose payment in the then only circulating medium of the country. Whether this is so or not, we are satisfied that at the maturity of the draft, Bradley, Wilson & Co. had of the funds of Luke Matthews more than enough to meet it; that it was not received in Confederate money; that they were authorized and instructed to apply it to the payment of this draft; and that they did so apply it in the ordinary course of dealings by these parties with their house. We have not been able to find, in this transaction, any evidence of fraudulent combination or collusion between Bradley, Wilson & Co. and Luke Matthews, and we hold that any relief claimed in this bill, based on that ground, must fail.

There is a foot-note to the original bill, dispensing with sworn answer; and unsworn answers to it were put in. The amended bill has no foot-note, and there is no direction found in the record relieving the defendants from making oath to their answers to that. The answers were put in without oath of their truth; but no objection to them on this

account was taken in the court below. Whether, under these circumstances, it was the duty of the defendants to make affidavit of the truth of the answers to the amended bill, we will not inquire. If such was the case, it was waived by the failure of complainant to object to it in the court below. It may be stated, also, in this connection, that the omission of a foot-note to the amended bill rendered it imperfect. But no objection has been urged on either of these grounds; and we will treat the answers as rightly put in without oath.

Answer, not under oath, is mere pleading—not evidence. Rev. Code, § 3328. No exception can be filed to such answer for insufficiency.—Rule of Practice No. 34. We do not think the same strictness in pleading is required in answers not sworn to, as in those which, under the rule, are required to be sworn to. We think the general denials in the answers to the amended bill are sufficient to put them in issue. There is, indeed, no averment, as fact, that Luke Matthews promised to pay in gold. The averment is only of a legal conclusion, deduced from the promise to pay in dollars, and the legal consequences resulting from the employment of that word.

Putting ourselves, as near as we can, in the attitude the parties occupied in January, 1862, we think the conduct of Luke Matthews was natural, and entirely free from blame. He prudently provided funds, in the hands of the drawee, to meet the draft. That drawee was the trusted friend and agent alike of W. W. Matthews and of himself. The funds were applied to the extinguishment of the draft, and, so far as we are informed, he was not advised that there was any dissatisfaction. No notice was given to him, that he might withdraw his funds from Bradley, Wilson & Co.—See *Smith v. Rowland*, 18 Ala. 665. The latter firm were equally the trusted friends and agents of W. W. Matthews. This is confirmed, if confirmation of what is stated above be necessary, by the fact that they were the drawees of the draft, and as such the parties to be primarily looked to for its payment; yet it was left with them by W. W. Matthews to be collected, and the proceeds remitted to him. We think that, in this transaction, Bradley, Wilson & Co. stood more in the relation of a common banker between the brothers than as an agent for Luke to pay, or for W. W. to collect.

In the case of *Eyles v. Ellis*, 4 Bing. 112, the principle is thus declared: "The plaintiff, in October, authorized defendant to pay in at certain bankers money due from the defendant. Owing to a mistake, it was not then paid; but defendant, who kept an account with the same banker, transferred the sum to the plaintiff's credit, on Friday, the 9th of

December. The plaintiff, being at a distance, did not receive notice of this transfer till the Sunday following, and on Saturday the bankers failed." Held a good payment.

A similar principle was declared in the case of *Stewart v. Aberdeen*, 4 Mees. & Wels. 211. See, also, *Anderson v. Robinson*, 3 Camp. 199; see, also, opinion of Spencer, Senator, in *Stone v. Hayes*, 3 Denio, on page 584, where he states this same principle. This, though a dissenting opinion, does not appear to have been disputed on this point.

If, when the money on this draft fell due, Luke Matthews had received of Bradley, Wilson & Co., of the moneys in their hands belonging to him, a sum sufficient to meet this draft, and had immediately repaid it to Bradley, Wilson & Co. on the draft, no one will dispute that the payment would have been good. We can perceive no material difference between the supposed case and the one in hand.

We think the complainant has no right of recovery against Luke Matthews—has no equitable demand against Bradley, Wilson & Co.—and the decree of the chancellor dismissing the bill is affirmed.

Chief Justice BRICKELL, having been of counsel, not sitting.